*Decision will be entered under Rule 50.*

COLUMBUS AND GREENVILLE RAILWAY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 83793. Filed August 4, 1964.

*Carl F. Bauersfeld*, for the petitioner.
*Glen W. Gilson II*, for the respondent.

DRENNEN, *Judge:* Respondent determined the following deficiencies in income tax and in additions thereto under section 293(b)[1] for the taxable years 1951, 1952, and 1953:

| Year | Deficiency | Addition to tax, sec. 293(b) |
|---|---|---|
| 1951 | $40,590.18 | $20,295.09 |
| 1952 | 14,457.99 | 7,228.99 |
| 1953 | 59,591.68 | 29,795.84 |

[1] All statutory references are to the Internal Revenue Code of 1939 unless otherwise noted.

The parties have filed a stipulation in which it is agreed, *inter alia*, that petitioner is not liable for the additions to tax under section 293(b) for the 3 years involved herein but that an addition to tax under section 293(a) is due from petitioner for the taxable year 1953, and respondent has filed amendment to answer making claim for the addition to tax under section 293(a). All other issues raised by the pleadings have been disposed of by the stipulation, and the agreements with respect thereto are incorporated herein by reference and adopted as a part of the Court's findings and conclusions, to be taken into consideration in arriving at the decision to be entered by the Court under Rule 50.

The only issue remaining for decision is whether petitioner's basis for assets subject to depreciation deductions upon retirement in 1951, 1952, and 1953 includes the amount of $2,038,335.80,[2] purportedly representing a liability which petitioner assumed or to which its assets were subject when acquired by petitioner in 1923. Respondent disallowed retirement deductions in 1951, 1952, and 1953 in the amounts of $55,956.20, $10,991.54, and $9,231.51, respectively, by elimination of the above amount from petitioner's basis in its assets.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation organized and existing under the laws of Mississippi, with its principal place of business in Columbus, Miss. It filed its Federal income tax returns for the years 1951, 1952, and 1953 with the district director (collector) of internal revenue, Jackson, Miss.

Petitioner keeps its books and records on the accrual method of accounting and reports its income on the basis of a calendar year. As a railroad, it uses the retirement method of accounting for depreciable property; that is, the cost of property retired each year is credited to the capital asset account and, with reduction for net salvage value (actual or estimated), is charged to expense and deducted in lieu of annual deductions for depreciation currently sustained with respect to the assets.

The Georgia Pacific Railway Co. (hereafter referred to as Georgia Pacific) was organized November 10, 1881, for purposes of constructing a railroad line from Atlanta, Ga., to the Mississippi River. In order to complete construction of this line of railroad, Georgia Pacific executed a "General First Mortgage" to the Central Trust Co. of New York, N.Y., as trustee, under which mortgage there were issued and delivered $5,660,000 of bonds. (There have been several

---

[2] The amount referred to in the notice of deficiency is $2,038,000, but the parties agree that the correct amount is $2,038,335.80.

successors to Central Trust Co., all of which will hereafter be referred to as Trustee.) This first mortgage was dated May 6, 1882, and, after reciting that Georgia Pacific owned completed lines as well as exclusive coal rights in 100,000 acres of land in the "Black Warrior Region" of Alabama and that the board of directors of Georgia Pacific had been authorized to issue first mortgage bonds "to the amount of twenty thousand dollars a mile for each mile of" lines completed or to be completed and to secure the bonds by executing and delivering a mortgage to Trustee, provided that Georgia Pacific conveyed all its property to Trustee, in trust, to secure the first mortgage bonds. The bonds, each in the principal amount of $1,000, were to be due January 1, 1922, and were to bear 6-percent interest, payable every 6 months upon surrender of coupons attached. Trustee had the discretionary authority to release assets from the lien created by the indenture, and Georgia Pacific had the right, at any time after maturity of the bonds, to advertise a time for payment of all unpaid bonds and, as to bonds not then presented for payment, to elect to pay the principal and interest thereof to Trustee and thereby satisfy the mortgage as if the holders had been paid at maturity, or to have Trustee enter satisfaction upon the mortgage for payment of bonds actually surrendered, thereby allowing the mortgage to stand as security for unpresented bonds which would thereafter bear no interest.

In 1888, Georgia Pacific issued bonds in an undisclosed amount, payment of which was secured by a second mortgage on the property of Georgia Pacific.

The railroad line from Atlanta to the Mississippi River was completed in 1888, and Georgia Pacific operated the line until July 17, 1893, when it met with financial reverses and was placed in receivership by the United States District Court for the Northern District of Georgia.

On August 21, 1894, the entire property of Georgia Pacific, under a decree of foreclosure and sale under the second mortgage entered by the District Court for the Northern District of Georgia, was transferred to Charles H. Coster and Anthony J. Thomas, subject to the Georgia Pacific first mortgage of May 6, 1882. Coster and Thomas used Georgia Pacific second mortgage bonds in payment of the purchase price of the property, which was $500,000.

Coster and Thomas immediately turned over possession of the Georgia Pacific property to the Southern Railway Co. (hereafter referred to as Southern), which was incorporated by an Act of the Virginia Legislature, approved February 20, 1894, for the purpose of taking over the property of a Virginia railroad and other defunct railroad properties. Pursuant to this Act, Southern filed its certificate of incorporation which recited that Southern was authorized to

issue $120 million in "First Consolidated Mortgage Gold Bonds," of which, it was stated, "a large part are not now to be issued." Annexed to the certificate of incorporation was a schedule listing properties embraced in the Southern system "and * * * also a statement of bonds and obligations issued or assumed by or chargeable upon property purchased by" Southern. Listed among the properties acquired by Southern (or by its Mississippi subsidiary) were those of Georgia Pacific, and included in the attached statement of obligations were the Georgia Pacific first mortgage bonds in the amount of $5,660,000.

After acquiring the Georgia Pacific property from, or through, Coster and Thomas, Southern took over the operation of the former Georgia Pacific railroad lines in Alabama and Georgia. However, in order to comply with the laws of Mississippi, there was organized a new corporation known as Southern Railway Co. in Mississippi (hereafter referred to as Southern in Mississippi), which was a subsidiary of Southern and which was chartered on August 31, 1894. Southern in Mississippi immediately took possession of and began operating the portion of the former Georgia Pacific railroad lines in Mississippi. The transfer of these properties to Southern and Southern in Mississippi, respectively, was later evidenced by a deed dated January 9, 1896, from the receiver of Georgia Pacific, Georgia Pacific itself, Trustee, Coster, and Thomas conveying all railroad properties of Georgia Pacific in Alabama and Georgia and all equipment anywhere to Southern, and all railroad properties of Georgia Pacific in Mississippi to Southern in Mississippi. The property was transferred subject to the two 1894 mortgages hereinafter mentioned and to all prior lien mortgages.

Bonds in the amount of $200,000, secured by a mortgage dated October 20, 1894, on the property of Southern in Mississippi executed in favor of Trustee, were issued by Southern in Mississippi to Coster and Thomas.[3]

Under date of October 2, 1894, Southern executed a "First Consolidated Mortgage Deed" to Trustee, conveying and transferring all its property, including bonds of Southern in Mississippi in the amount of $200,000, to secure 5-percent first mortgage bonds to be issued by Southern in the total principal amount of $120 million. This mortgage deed recited resolutions of the stockholders of Southern which provided that, of the total amount of bonds authorized, the amount of $69,124,700 was not to be presently issued but was to be thereafter issued from time to time "in retiring and acquiring bonds" then out-

---

[3] These bonds were apparently subsequently transferred to Southern, as they are mentioned in the Southern mortgage of Oct. 2, 1894. However, they do not enter into the issue here involved.

standing, secured by mortgages on property of Southern, including the Georgia Pacific bonds in the amount of $5,660,000.

The mortgage deed provided:

2. Out of and from the remainder of such authorized issue [of $120 million], there shall be reserved, not immediately to be executed or certified by the Trustee, bonds to the amount of * * * ($69,124,700), for the purpose of providing for the purchase, redemption and acquisition by the Trustee, as hereinafter provided, of the bonds now outstanding secured by the twenty-three following mortgages, which to the extent therein specified and in respect of the several properties therein mentioned are hereby expressly recognized and declared to constitute liens prior and superior to that created by this indenture.

\*      \*      \*      \*      \*      \*      \*

(17) The mortgage of the Georgia Pacific Railway Company, dated May 6, 1882, to Central Trust Company of New York, as Trustee, to secure bonds due January 1st, 1922, of which $5,660,000 are now outstanding.

\*      \*      \*      \*      \*      \*      \*

3. The said $69,124,700 bonds hereby secured and reserved for the redemption, purchase or acquisition of a like amount of bonds (hereinafter called "prior lien bonds") severally and respectively secured by the twenty-three mortgages last above mentioned shall from time to time be issued, certified and delivered, only as follows, viz.:

(a) Whenever and as often as the Railway Company shall tender or cause to be tendered any such prior lien bonds, together with all unmatured interest obligations thereunto belonging, the Trustee forthwith shall receive the same, and in exchange therefor shall certify and deliver to the Railway Company, or upon its order, a like amount at par of the said bonds hereby secured and reserved.

(b) Whenever and as often as the Railway Company, after the maturity of any such prior lien bonds, shall tender or cause to be tendered, cash sufficient to purchase or acquire the same at par, the Trustee forthwith shall receive such cash, and in consideration thereof shall certify and deliver to the Railway Company or upon its order an equivalent amount at par of the said bonds hereby secured and reserved.

(c) All cash so received by the Trustee shall be by it held and applied to the purchase and acquisition at par of an equivalent amount at par of prior lien bonds, which shall have matured at or before the time of such purchase or acquisition.

All and every prior lien bond received by the Trustee shall be by it stamped with the words "Not negotiable, but held in trust for the purposes declared in the First Consolidated Mortgage Deed of the Southern Railway Company dated October 2, 1894," and shall be by it held as additional security for the payment of this mortgage debt, until it shall have received at least ninety-nine per cent. of all prior lien bonds of the issue of which such bond is one, whereupon in its discretion it may cancel and surrender to the Railway Company all prior lien bonds of such issue then in its possession. So long as the Railway Company shall not be in default under this indenture, the Trustee shall not collect, or be entitled to collect, except with the assent of the Railway Company, the interest

on any prior lien bond at any time held by it hereunder. Any sums so collected by it with the assent of the Railway Company shall at once be paid over to the Railway Company, except as hereinafter expressly provided otherwise.

The Railway Company shall provide and maintain books wherein it shall register as the property of the Trustee, all such prior lien bonds received by the Trustee; and except as herein expressly provided no such prior lien bond shall be canceled, unless the holder thereof, at time of maturity, shall require cancellation as a condition of surrender.

Southern established on its books an account for Georgia Pacific first mortgage bonds indicating a liability in the amount of $5,660,000. This amount was also recorded as a portion of the cost of its properties. In 1915 Georgia Pacific first-mortgage bonds in the amount of $5,000 were lost by the holder. To replace them Southern issued its first consolidated mortgage 5-percent bonds in like amount and, in June 1916, made entries on its books reducing the liability for bonds under the Georgia Pacific first mortgage by $5,000 and increasing the liability for bonds issued under its own consolidated mortgage by $5,000.

On November 6, 1920, the charter of Southern in Mississippi was amended and its name was changed to Columbus & Greenville *Railroad* Co. (hereinafter referred to as C. & G. Railroad Co.).

On January 1, 1921, Georgia Pacific first-mortgage bonds in the amount of $5,655,000 were outstanding.

On September 27, 1921, Southern applied to the Interstate Commerce Commission for authority to "issue and sell" its first consolidated mortgage 5-percent bonds "for the purpose of providing funds for the redemption of an equal amount" of Georgia Pacific first-mortgage bonds, which, the Commission found, Southern had assumed. The Commission granted this authority to Southern to sell its bonds for cash at a certain minimum price, the proceeds to be applied exclusively to the payment of the $5,655,000 of Georgia Pacific bonds, with Southern to report to ICC after the sale all pertinent facts relating to the sale, the payment and cancellation of the bonds, and the satisfaction and discharge of the Georgia Pacific mortgage.

On November 16, 1921, Southern transmitted a check in the amount of $5,655,000 drawn on J. P. Morgan & Co. to Trustee to acquire Georgia Pacific first-mortgage bonds in the amount of $5,655,000 at maturity on January 1, 1922, and instructed Trustee to deliver $5,655,000 of its own first-mortgage bonds to J. P. Morgan & Co.

Immediately after Southern issued its first consolidated mortgage bonds in the amount of $5,655,000, there were recorded on its records two liabilities in the amount of $5,655,000, one for Georgia Pacific first-mortgage bonds in that amount and the second for its own consolidated first-mortgage bonds. But it also recorded an asset in the form of the cash deposit of November 16, 1921, held by Trustee, in the amount of $5,655,000.

Trustee proceeded to acquire the Georgia Pacific first-mortgage bonds, at face value from the holders thereof, as follows:

| Month | Amount |
|---|---|
| Nov. 1921 | $108,000 |
| Dec. 1921 | 30,000 |
| Jan. 1922 | 5,375,000 |
| Feb. 1922 | 73,000 |
| Mar. 1922 | 11,000 |
| Apr. 1922 | 8,000 |
| May 1922 | 12,000 |
| June 1922 | 13,000 |
| July 1922 | 11,000 |
| Nov. 1922 | 8,000 |
| Jan. 1923 | 1,000 |
| Feb. 1923 | 2,000 |
| May 1923 | 1,000 |
| Dec. 1923 | 1,000 |
| Total | 5,654,000 |

As Trustee acquired the foregoing bonds, each was stamped "Not negotiable, but held in trust for the purposes declared in the First Consolidated Mortgage Deed of the Southern Railway Company, dated October 2, 1894." Also, as the bonds were acquired by Trustee, Southern recorded on its books reductions in the liability for the Georgia Pacific first-mortgage bonds and corresponding reductions in the asset in the form of cash deposited with Trustee in the amount of $5,655,000.

By May 1923 Trustee thus acquired all the outstanding Georgia Pacific first-mortgage bonds except two, and by December 1923 had acquired all of the Georgia Pacific bonds, except for one in the face amount of $1,000. It was presumed that this bond was lost, and Trustee returned $1,000 to Southern on or about December 21, 1949. By letter dated May 29, 1923, the president of Southern authorized and instructed the assistant secretary of Southern to destroy and join with Trustee in the destruction of 5,662 of the paid and canceled Georgia Pacific bonds and to certify to same.

On June 4, 1921, C. & G. Railroad Co. was placed in receivership by the United States District Court for the Northern District of Mississippi. The railroad was operated by a receiver until August 6, 1923, when the property of C. & G. Railroad Co. was sold at public auction by order of the District Court. The railroad property was purchased by three trustees, George Y. Banks, Henry Hart, and Alfred H. Stone (hereafter referred to as Banks, Hart, and Stone, respectively), who proceeded to organize petitioner, Columbus & Greenville *Railway* Co., for the purpose of operating the railroad. The sale of the property to Banks, Hart, and Stone for $35,000 (which the individuals had paid when their bid was accepted) was confirmed by the District Court on September 12, 1923, and on this date a special com-

missioner of the court executed a deed conveying the real property of C. & G. Railroad Co. to Banks, Hart, and Stone, who, on the same date, executed a deed conveying the property to petitioner. In each deed it was recited that the conveyance was subject to the Georgia Pacific first mortgage of 1882 to secure bonds in the amount of $5,660,000, and was subject to the mortgage executed by Southern in Mississippi in 1894 to secure its bonds in the amount of $200,000.

In February 1926, petitioner was in financial difficulties and its president began negotiations with Southern regarding how much, if any, of the Georgia Pacific indebtedness of $5,660,000 petitioner should assume, and how and when the same should be paid. These negotiations resulted in an agreement, the conditions of which petitioner's president reported to its directors on February 22, 1926, as follows:

1. The lien on the Columbus and Greenville Railway to secure the bonded indebtedness of the Georgia Pacific Railway Company of $5,650,000. [*sic*] with accrued interest, is to be cancelled at once, and that portion of the old Georgia Pacific Railway which lies in Mississippi, and which now constitutes the Columbus and Greenville Railway, extending from the Alabama line west to Greenville, Mississippi, a distance of approximately 180 miles, is to be released of record from said lien.

2. The Southern Railway Company agrees that during three years, from January 1, 1926, it will pay the Columbus and Greenville Railway Company $10,000. per annum rental for that portion of the Columbus and Greenville Railway Company's line, which extends from Columbus, Mississippi to the Alabama state line.

3. The Columbus and Greenville Railway Company agrees to pay the Southern Railway Company $10,000. per annum interest on the $200,000. bonded indebtedness of the Southern Railway Company in Mississippi during the said time; the rent will balance the interest.

On April 19, 1926, petitioner's president wrote an officer of Southern confirming the foregoing agreement, stating as follows:

Confirming my several conversations with Mr. Harrison and yourself, if it shall at any time become necessary by virtue of legislation for railroad consolidation or otherwise for the Southern to take over the properties of this Company, either directly or indirectly, I agree on behalf of the [petitioner] that the price at which its properties shall be taken over shall not exceed the amount which the present owners have put into the property, plus the value of any additions and betterments that may be added, the purpose being, in the event stated, that the owners of the property shall be reimbursed and saved whole for the money which they may have put into the property, including net earnings devoted to additions and betterments which would otherwise have been paid out in dividends.

The consideration for this agreement is the waiver by the Southern of any and all claims for reimbursement by the [petitioner] of its proper proportion of the amount paid by the Southern to retire the bonds of the Georgia Pacific secured by a mortgage on the old line of that Company from Atlanta, Georgia, to Greenville, Mississippi, including the present properties of the [petitioner]; the cancellation of the lien of said mortgage on the property of the [petitioner] and its satisfaction of record; the waiver by the Southern of all interest prior to the current year on the bonds of the Southern Railway in Mississippi in the principal sum of $200,000. secured by a mortgage or deed of trust on the property of

the [petitioner]; and the lease by the Southern for a term of three years, beginning January 2, 1926, of that part of the line of the [petitioner] between the Alabama-Mississippi State Line and the yard limit board at Columbus.

It is understood and agreed, however, that the foregoing is not to be construed as a restriction or limitation on the right of the present owners and operators of the [petitioner] to mortgage its properties, or otherwise to obtain credit in the operation of its railway, or to sell its stocks and bonds.

On May 3, 1926, Trustee canceled and cremated all the Georgia Pacific first-mortgage bonds which it had in its possession.[4]

Southern requested Trustee to execute a release of the lien of the Georgia Pacific first mortgage on all property subject thereto, and, on May 3, 1926, Trustee executed, to Southern and to petitioner, a release and satisfaction of the Georgia Pacific first mortgage. In this instrument it was certified that all bonds secured by the mortgage, together with coupons, had been redeemed and paid in full by Southern or that ample provision had been made for their payment and redemption.

Under date of June 27, 1928, petitioner's president received an opinion from counsel in which it was stated that Banks, Hart, and Stone had acquired the railroad property on behalf of petitioner subject to the liability for Georgia Pacific first-mortgage bonds in the amount of $5,660,000, "of which amount afterward the sum of $2,038,335.80 was allocated, or made applicable, to the mileage bought by" petitioner, together with accrued interest.

On July 27, 1928, petitioner requested permission of the Interstate Commerce Commission to make certain entries on its books, which, it was explained, were "to record its liability under Georgia Pacific first mortgage bonds and the subsequent disposition of this liability through the release of the property from the lien created by the mortgage."

These entries were as follows:

*Entry No. 36.*—A debit in the amount of $2,038,335.80 to the account termed "Property Investment—Road" and a credit in the same amount to "Funded Debt Matured Unpaid."

These debits and credits were explained as follows:

For entry to record on the books, this Company's liability under the first mortgage of the Georgia Pacific Ry Co to the Central Trust Company of New York, Trustee, dated May 6, 1882, subject to which mortgage this Company purchased its property on Aug. 6, 1923.

On that date, pursuant to a decree of sale issued by the District Court of the United States for the Northern District of Mississippi, Eastern Division, in suit of Willis Coal and Mining Company vs Columbus and Greenville Railroad Company, all the property of the Columbus and Greenville Railroad Company was sold at public auction to George Y. Banks, Henry Hart and Alfred Stone,

---

[4] Trustee certified that it cremated bonds in the principal amount of $5,657,000, although it would appear that it had acquired only $5,654,000 in bonds. Perhaps some of the bonds deemed lost in 1915 had been presented to Trustee.

Trustees, for $35,000 cash, subject to first mortgage of the Georgia Pacific Railway Company to the Central Trust Company of New York, Trustee, dated May 6, 1882, and to the mortgage of the Southern Railway Company in Mississippi to the Central Trust Company of New York, Trustee, dated Aug. 20, 1894, the said Columbus and Greenville Railroad Company having become the successor in obligation to the mortgagors in both of said mortgages.

On Sept. 12, 1923, the Columbus and Greenville Railway Company acquired from the said Trustees the property which they purchased, for $35,000 cash and its issue of capital stock, subject to the above mentioned mortgages.

Under the Georgia Pacific first mortgage of May 6, 1882, there were issued $5,660,000 of bonds maturing Jan. 1, 1922, the bonds having been issued at the rate of $10,000 per mile on the entire mileage of the Georgia Pacific Railway and were a first lien on the property of the Columbus and Greenville Railroad Company in the State of Mississippi, and the Southern Railway in the states of Georgia and Alabama. The property of the Columbus and Greenville Railroad Company having passed into the hands of a Receiver on June 4, 1921, the Receiver sold during that year branch lines between Itta Bena and Webb, Mississippi, and between Stoneville and Percy, Mississippi, aggregating 57.80 miles free from all lien, these properties later being either abandoned or turned over to private interest for other than common carrier purposes.

Although no entries were ever made on the books of the Columbus and Greenville Railroad Company representing its liability under the Georgia Pacific mortgage, the liability existing under the mortgage and acquired by the Columbus and Greenville Railway Company is as follows:

Mileage of Georgia Pacific Ry_____ 560. 59
Mileage disposed of by receiver_____ 57. 80
Mileage purchased by C & G Ry. Co_____ 181. 07
    Main line_____ 179. 10
    G.P. main line now classed as yard tracks_____ 1. 97

    Total _____ 181. 07
Original Georgia Pacific mileage remaining after retirement of 57.80
   miles by receiver_____ 502. 79
Percentage of mileage of C. & G. Ry. Co. to remaining Georgia Pacific
   mileage _____ . 36013
Amount of Georgia Pacific bonds_____ $5, 660, 000. 00
Amount of Georgia Pacific bonds applicable to C. & G. Ry_____ $2, 038, 335. 80

In 1922, upon the maturity of the Georgia Pacific bonds, provision was made for their payment by the Southern Railway thru the issue of its consolidated mortgage, the Georgia Pacific bonds being held by that Company for the purposes of the mortgage as provided in such mortgage.

On the date which this Company purchased its property, namely Aug. 6, 1923, there were outstanding $2,038,335.80 of Georgia Pacific bonds which were a first lien on the property and that amount is accordingly by this entry set up in the account 764 "Funded Debt Matured Unpaid" and included in the cost of road purchased.

There are attached hereto and made parts of this entry a copy of the decree of sale under which this Company purchased its property and opinion of counsel relating to the legal liability existing under the Georgia Pacific mortgage at the time of purchase.

*Entry No. 37.*—A debit in the amount of $2,038,335.80 to "Funded Debt Matured Unpaid," a debit in the same amount to "Profit and

Loss," a credit in the amount of $2,038,335.80 to "Profit and Loss," and a credit in the same amount to "Additions to Property Through Income and Surplus."

These entries were explained as follows:

For entry to clear from the account "Funded Debt Matured Unpaid" this Company's liability under the First Mortgage of the Georgia Pacific Railway Company to Central Trust Company of New York, Trustee, dated May 6, 1882 subject to which this Company acquired its property on August 6th, 1923.

By concurrent entry there has been set up in the above styled account the amount of $2,038,335.80, representing this Company's proportion of liability under the said Georgia Pacific First Mortgage, which was a first lien on the property at time of purchase.

Provision having been made for the payment of the Georgia Pacific Bonds outstanding under its First Mortgage of May 6th, 1882 without recourse on the property of the Columbus and Greenville Railway Company, on May 3rd, 1926 the Central Trust Company of New York, Trustee, released this Company from all liability existing under the said mortgage, and the amount of this liability, $2,038,335.80, is by this entry set up in Profit and Loss and concurrently credited to the account 779 "Additions to Property through Income and Surplus".

A copy of the release issued by the Central Trust Company of New York, Trustee, under date of May 3rd, 1926 is attached hereto and made a part of this entry.

The Interstate Commerce Commission approved the proposed entries with the understanding that responsibility for the accuracy thereof rested with petitioner, and in August 1928, petitioner made the entries on its books. Thereafter petitioner continued to include this $2,038,335.80 in the cost basis of its property; and the propriety of doing so gives rise to the issue here involved.

With respect to entry No. 37 above, which reflects a credit to "Profit and Loss" in the amount of $2,038,335.80, this amount was not reported as income for Federal tax purposes by petitioner for 1928 or for any other year.

Petitioner has never paid any portion of the amount of $2,038,335.80 to Southern or to any other party.

Neither Southern nor Trustee has, directly or through a subsidiary, ever owned stock of petitioner.

Prior to the years here involved petitioner claimed losses on its returns on retirement of its property based on the inclusion of the $2,038,335.80 above-mentioned in its basis for the property. No changes were made with respect to such claimed losses by respondent's agents upon examination of those returns.

#### OPINION

The only issue remaining for decision is whether petitioner may include in its basis for computing deductions for depreciation by the retirement method the sum of $2,038,335.80, or any part thereof, which it set up on its books in 1928 as its proper share of the $5,660,000 face

amount of bonds secured by a mortgage on its property and other properties, subject to the lien of which it acquired its property at a public sale by the receiver of another railroad company in 1923. Petitioner admits that it has never actually paid any part of the $2,038,335.80 to anyone, that the bonds were canceled and destroyed and the mortgage was released as satisfied in 1926, and that it has never included any part of the $2,038,335.80 in its income.

A brief summary of the facts is as follows. The railroad properties which petitioner acquired in 1923, together with other railroad properties, all of which were at one time owned by Georgia Pacific Railway Co., were mortgaged in 1882 to secure the payment of $5,660,000 in bonds issued by Georgia Pacific to acquire funds to complete its railroad from Atlanta, Ga., to the Mississippi River, and for other purposes. Georgia Pacific became insolvent by 1893 and all the properties secured by the mortgage were sold upon foreclosure of a second mortgage. Southern, which had been incorporated in Virginia to take over the properties of a defunct Virginia railroad and other defunct railroad properties, or persons acting for it, bought all the properties at a special master's sale. Most of the properties, except those in Mississippi, were transferred to Southern. Because of Mississippi law, a Mississippi corporation, Southern in Mississippi, was formed as a wholly owned subsidiary of Southern and the property in Mississippi was transferred to Southern in Mississippi. All of the Georgia Pacific properties acquired by both Southern and Southern in Mississippi were acquired subject to the Georgia Pacific first mortgage.

At or about the same time, Southern acquired numerous other railroad properties and in 1894 mortgaged all of the properties owned by it to secure $120 million in face value of first-mortgage bonds issued, or to be issued, by Southern for operating expenses, completion of railroad beds, retirement of prior lien mortgages when they became due, and for other purposes. Southern in Mississippi was not a party to this mortgage and neither its properties nor its stock were pledged under the mortgage, although $200,000 of its first-mortgage bonds were so pledged. Under the terms of its charter and of its first mortgage mentioned above, Southern assumed liability for payment of the $5,660,000 of bonds issued by Georgia Pacific and secured by its first mortgage of 1882.

In 1921 Southern in Mississippi, whose name had been changed to Columbus & Greenville Railroad Co., was in financial difficulties and its properties were placed in receivership and operated by the receiver until 1923. In 1923 the properties of the Mississippi corporation were sold at public sale to petitioner, a corporation formed in 1923 to take over these properties. The properties were transferred to petitioner subject to the Georgia Pacific mortgage of 1882 and subject to the $200,000 mortgage of the predecessor Mississippi corporation.

In 1921 Southern issued a sufficient amount of its first-mortgage bonds to acquire and redeem all of the Georgia Pacific bonds then outstanding. The funds for this purpose were turned over to Trustee, which acquired all except $2,000 face value of the Georgia Pacific bonds by May 1923 and had acquired all but $1,000 of these bonds by the end of 1923. The Georgia Pacific bonds were not immediately canceled but were held alive by Trustee as additional collateral under the Southern first mortgage until 1926. By agreement between petitioner and Southern in 1926, petitioner was relieved of all obligations under the Georgia Pacific mortgage and Trustee destroyed the bonds and issued a release and satisfaction of the Georgia Pacific mortgage to both Southern and petitioner. Petitioner, which had not theretofore made any entry on its books reflecting its liability under the Georgia Pacific mortgage, made entries in its records in 1928 which had the effect of charging $2,038,335.80, which it computed on a mileage basis to be its share of the liability under the Georgia Pacific mortgage, to cost of its railroad properties and crediting a like amount to surplus.

Despite the fact that it admittedly has paid no part of the $2,038,-335.80 to anyone, nor included any part thereof in its income, petitioner claims that it is entitled to include that amount in its basis for its depreciable property on the theory that its basis is its actual cost plus the balance due on any mortgage on the property at the time it was acquired which it either assumed or subject to which it acquired the property. Petitioner cites in support of its position *Amphitrite Corporation*, 16 T.C. 1140 (1951) ; *Edward W. Edwards*, 19 T.C. 275 (1952) ; and *Marion A. Blake*, 8 T.C. 546 (1947). We cannot agree that those cases necessarily support petitioner's position. In *Amphitrite Corporation, supra*, the taxpayer-purchaser of the property had assumed the obligations of its predecessor, which later became barred by the statute of limitations and the question was whether its basis should be reduced. In *Edward W. Edwards, supra*, the taxpayer paid the full amount claimed as his basis for the stock sold, but had borrowed the money to do so and was later able to pay off the indebtedness at less than face amount. In *Marion A. Blake, supra*, the taxpayer had borrowed the money to construct the buildings and was personally liable therefor. In the present case there is no claim that petitioner assumed or was personally liable for the indebtedness secured by the Georgia Pacific mortgage. Petitioner must rely for its stepped-up basis on the theory that its basis includes some amount of the obligations secured by a mortgage subject to which it acquired the property without assuming personal liability therefor. The cases relied upon by petitioner do not bridge the gap between the basis of property acquired only subject to a mortgage as opposed to the situation where the purchaser assumes the obligations under the mortgage.

Petitioner's principal theory finds some support in *Crane* v. *Commissioner*, 331 U.S. 1 (1947), which held that the basis of property inherited is the value of the property at date of death undiminished by mortgages on the property. The basis there involved started with value, not cost as in the case of a purchase. Whether the theory of the *Crane* case means that in a "purchase" situation the cost of the property acquired includes the liens thereon, even though not personally assumed by the purchaser, compare *Blackstone Theatre Co.*, 12 T.C. 801 (1949), with *Fortee Properties, Inc.*, 19 T.C. 99 (1952), revd. 211 F. 2d 915 (C.A. 2, 1954), certiorari denied 348 U.S. 826 (1954), we need not decide here, because we do not think the theory of the *Crane* case is applicable here in any event.

The starting point for determination of the issue here involved is section 113 of the 1939 Code, which provides that "The basis of property shall be cost of such property" with certain adjustments not pertinent to this inquiry. Accordingly, the decisive question is what was the cost of the property acquired by petitioner in 1923. See *Albany Car Wheel Co.*, 40 T.C. 831 (1963), affirmed per curiam 333 F. 2d 653 (C.A. 2, 1964). The Supreme Court held in *Detroit Edison Co.* v. *Commissioner*, 319 U.S. 98 (1943), that a taxpayer's basis in property is the cost of the property to the taxpayer, and that generally the taxpayer's outlay is the measure of his recoupment through depreciation accruals. Here the cost of the property to petitioner and petitioner's actual outlay for the property did not include any part of the $2,038,335.80 here in controversy. But petitioner argues that nevertheless the amount of the mortgage subject to which petitioner acquired the property, or an allocable portion thereof, is includable in its cost basis anyway on the theory that under *Amphitrite Corporation, supra,* the obligations of a seller assumed by the purchaser become a part of the purchaser's basis, and under *Crane* v. *Commissioner, supra,* it makes no difference whether the purchaser assumes the seller's obligations or simply takes subject to those obligations—the result is the same and the amount of those obligations is added to the purchaser's basis in the property acquired.

Assuming for purposes of discussion, but without deciding, that the theory of the *Crane* case may be applied in the ordinary purchase situation, we do not think it can be applied under the circumstances of this case because to do so would be to negate the basic concept of depreciation deductions, which is to permit a taxpayer to recover through depreciation allowances only his cost or other basis in the property. In the cases cited by petitioner, the amounts in question had been a part of the taxpayer's purchase price of the property or had been a part of the cost of constructing the property. And in *Crane* the value of the property was admittedly equal to the face amount of the mortgage subject to which the property was received. In each of those

cases the obligation to which the property was subject at the time it was acquired was fixed in amount and was a part of the original cost of the property to taxpayer or, in the *Crane* case, was the value of the property inherited. Such is not the situation in the present case.

Here petitioner bought the property involved in August 1923 for $35,000 cash, subject to the $200,000 mortgage issued by its predecessor corporation and subject to the Georgia Pacific first mortgage. At the time of the purchase Southern had redeemed and paid all except $2,000 of the bonds issued under the Georgia Pacific mortgage when they became due in January 1922 as it had planned and agreed to do in its charter and its own first mortgage. Of course, the lien of the Georgia Pacific mortgage had not been released of record so the property acquired by petitioner could only be conveyed to it subject to the lien of that mortgage. It is doubtful in our minds, however, because of the past history of Southern's relations with the Mississippi corporation and the fact that the Mississippi corporation was in receivership at the time of the sale to petitioner, that it was anticipated by either petitioner or Southern that petitioner would ever pay any portion of the amounts due under the Georgia Pacific mortgage.

A strict application of petitioner's theory would seem to require inclusion in petitioner's cost of the entire $5,660,000 of the bonds then outstanding under the Georgia Pacific mortgage, subject to the lien of which petitioner acquired the property. But certainly this would not be permissible because the Georgia Pacific properties acquired by Southern were also acquired subject to the Georgia Pacific mortgage and Southern could also claim the entire face value of the outstanding bonds as a part of its basis in its property, which it apparently did. The most that could be said is that petitioner acquired its property for the cash it paid, plus the $200,000 in bonds issued by its predecessor corporation, and plus an indeterminate amount of the total obligations under the Georgia Pacific mortgage. At the time it acquired its property in 1923, we do not think it could be determined with any degree of certainty what the latter amount would be, if anything. This is supported by the fact that petitioner entered none of this amount on its books until 1928. The arbitrary allocation of $2,308,335.80 of the total indebtedness under the mortgage to petitioner's property, computed on a mileage basis, may have been a basis for argument by Southern but this was not the amount for which petitioner was definitely obligated when it bought the property in 1923; nor was it a definitive part of petitioner's cost at that time. Nor was the property acquired by petitioner the only security under the mortgage, as was the case in *Crane*.

In *Albany Car Wheel Co.*, *supra*, we found that the purchaser-taxpayer's obligation under the purchase agreement to procure a release of the predecessor's liability under a union contract for severance

pay was of such a contingent character that it could not be considered a part of the cost of the assets acquired. We think a similar situation existed in this case at the time petitioner acquired the property; and that this fact precluded the inclusion of any of this contingent amount in petitioner's original cost basis in the property.

But, unlike in the *Albany* case, we have before us a year subsequent to the time when petitioner's obligations under the mortgage became fixed, so we will take the intervening events into consideration in determining petitioner's basis in 1951, 1952, and 1953. Assuming that the Georgia Pacific bonds were still alive even after Southern redeemed them at and after maturity,[5] Southern was the equitable owner of all of them (except one which was never presented for redemption) both in 1923 and in 1926, and any obligation of petitioner or its properties with respect thereto would have to be determined either by negotiations with Southern or as a result of some action taken by Southern, or Trustee at Southern's request, to determine the amount of that obligation and to enforce it. In 1926 petitioner negotiated an agreement with Southern in which it was agreed that petitioner had no obligation under the mortgage; and Trustee thereupon released the mortgage to both petitioner and Southern and destroyed the bonds, presumably at Southern's request. It was not until that time that petitioner knew whether it would have to pay anything under the mortgage as a part of its cost of its properties. The agreement with Southern provided that it would not have to pay anything—so no part of any obligation it had to Southern can be included in its cost of the properties. Petitioner did not assume payment of any part of the mortgage and it had no obligation with respect to this mortgage to its vendor. Consequently no part of the amount secured by the Georgia Pacific mortgage can be considered a part of the cost of the property to petitioner.

In its reply brief petitioner also seems to rely on the theory that petitioner was not required to pay any of the obligation under the Georgia Pacific mortgage because Southern forgave the obligation, which would not reduce petitioner's basis. As above noted we do not think petitioner's basis ever included any part of that obligation. But in addition we do not think this is a case of forgiveness of indebtedness. Petitioner was not indebted to Southern. Its property was subject to the lien of a mortgage securing bonds held by Southern—but petitioner had no personal liability therefor and the amount its properties might be liable for was subject to negotiation. The negotiations resulted in no liability. While it may be true that where one party pays the entire obligation for which he and another party

---

[5] Southern's president had instructed its assistant secretary to cancel and destroy the bonds in May 1923.

are jointly liable under a mortgage, the payor is subrogated to the rights of the mortgagee to the extent necessary to reimburse him for the amount for which he was not primarily responsible, see 83 C.J.S., sec. 18, p. 619, this doctrine is not applicable here, because petitioner was not primarily responsible for any part of the obligation paid by Southern. Perhaps Southern could have brought suit against petitioner or its properties for a contribution, but until it did so there was no fixed indebtedness for which either petitioner or its properties were primarily responsible. There was no fixed amount which could be forgiven. We find no reason for adding anything to petitioner's original cost basis in the property under this theory.

Petitioner also argues that the fact that respondent's agents had examined its returns for a number of years without disturbing its deductions for retirement should be given considerable weight by the Court.[6] We can give this fact little weight here because petitioner has been in possession of all the facts ever since it acquired the property and there is no evidence it has ever called the origin of this account to the attention of respondent's agents. We note also that petitioner did not report this $2,038,335.80 in its income as it presumably should have done under its theory of the case.

We conclude that petitioner is not entitled to include any part of the $2,038,335.80 in its basis for computing deductions for retirement, and hold for respondent on this issue.

To reflect agreements on other issues,

*Decision will be entered under Rule 50.*

