**GIBSON PRODUCTS CO.—Kell Blvd., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. CA–7–76–77.**

United States District Court,
N. D. Texas,
Wichita Falls Division.

Nov. 17, 1978.

Robert I. White, Houston, Tex., Paul W. Eggers, Dallas, Tex., for plaintiff.

M. Carr Ferguson, Dept. of Justice, Washington, D. C., Howard A. Weinberger, Lawrence L. Jones, Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT M. HILL, District Judge.

Came on for trial before the court the above-styled cause. Having considered the pleadings, testimony, stipulations and argument of counsel, the court is of the opinion that judgment should be rendered for the plaintiff in part and for the defendant in part.

### Facts

The facts which give rise to this lawsuit are summarized in the following manner. Plaintiff, a Texas corporation having its principal place of business in Wichita Falls, Texas, became a limited partner in 1972 of the McNeill Street Drilling Venture ("McNeill Street"), a Texas limited partnership. The limited partnership was formed in December of 1972 for the purpose of acquiring oil and gas leasehold interests and engaging in the drilling of oil and gas wells on various leases. Robert K. Pace ("Pace") and Harold D. Rogers ("Rogers") were the general partners. The total number of limited partners was thirteen, including plaintiff. Plaintiff's cash contribution to the partnership was $25,000.

In the same year, McNeill Street entered into a joint venture with Midwest Drilling Venture ("Midwest") to acquire certain oil and gas leases (the combined joint venture hereinafter referred to as "McNeill Street/Midwest"). Under their joint venture arrangement McNeill Street was to

participate to the extent of 59 percent, and Midwest was to participate to the extent of 41 percent. Thereafter, on December 29, 1972, McNeill Street/Midwest entered into an agreement to purchase five oil and gas leases from Galaxy Oil Company ("Galaxy"). As part of the purchase arrangement, the parties also agreed to a "no-out" turnkey drilling contract, whereby Galaxy agreed to drill a test well on each of the prospects. The drilling of each of the wells was to commence on or before January 31, 1973, subject to an oral understanding of the parties to grant reasonable extensions of time. The consideration for the leases was $63,500, of which $25,400 was paid in cash, and $38,100 was represented by the purchasers' note. The allocable share of McNeill Street in these amounts was cash: $14,986 (59% of $25,400), and note liability: $22,479 (59% of $38,100). The consideration for the drilling obligations was $1,036,500, of which $414,600 was paid in cash, and $621,900 was represented by the purchasers' note. The allocable share of McNeill Street in these amounts was cash: $244,614 (59% of $414,600), and note liability: $366,921 (59% of $621,900).

The promissory note, which covered the liability of $660,000 ($621,900 + $38,100), was dated December 29, 1972, and was payable with interest on January 1, 1977. The note was nonrecourse, Galaxy's sole recourse for nonpayment being determined by the terms of the mortgage and security agreement entered into by the parties to the transaction, and the properties pledged thereunder. More specifically, the security for the debt was the oil and gas leases, any operating equipment on the leases owned by the mortgagor, and eighty percent of all hydrocarbons produced by any completed well on the leases. Under the terms of the loan agreement, Galaxy was also given an option, after drilling had been completed to

the casing point and if the partnerships elected to complete any of the oil and gas wells so drilled, to enter into a joint venture arrangement with the partnerships for completion of the particular well and for ownership, development, and operation of the well.[1]

The fair market value of the leases in 1972 was $63,500. No value was proven for 1972 with respect to the operating equipment or the possible production from the drilled wells. The price for the drilling obligations, $1,036,500, was fair and reasonable. It has not been proven, on a reasonable basis, that the value added to the leases by such drilling would be commensurate with that price, nor that any value would be added by the drilling, apart from any production which resulted therefrom.

As a result of the foregoing transactions, McNeill Street, an accrual-basis taxpayer, deducted in its 1972 return $611,535 as its proportionate share of the intangible drilling costs, which it elected to expense rather than to capitalize. See I.R.C. § 263(c). Total loss of McNeill Street for that year was alleged to be $661,760. Plaintiff, in turn, deducted $49,317.34 as its share of the partnership's loss which resulted from the intangible drilling costs. Plaintiff's purported basis in its partnership interest was $56,403.23, the $25,000 cash investment plus $31,403.23 as its share of the nonrecourse liability. Upon examination of the McNeill Street partnership return for 1972, the Internal Revenue Service ("Service") disallowed as a deduction the $611,535 of intangible drilling costs and, therefore, disallowed the plaintiff's deduction of $49,317.34 attributable to McNeill Street's operations. As a result of this disallowance, the government assessed and collected from plaintiff additional taxes for 1972 of $25,414.48, part of which was attributable to the disallowance of partnership losses of $49,317.34.[2]

---

1. The drilling efforts of Galaxy resulted in one successful well out of the five wells drilled. The production from this well will apparently ensure the payment of the promissory note.

2. The plaintiff is seeking to recover the entire amount of $25,414.48. This figure is based on

the inclusion of $49,317.34 in income as the plaintiff's share of the McNeill Street's alleged loss, and the disallowance of $3,629.51 in deductions for profit-sharing plan contributions. Plaintiff has not, however, objected to the disallowance of the latter deduction in this case. The parties have agreed to recalculate the

The government also assessed against plaintiff interest of $6,173.27 for 1972.[3] Within two years after plaintiff paid the $25,414.48 of additional taxes, plaintiff filed a claim for refund. Upon examination of the claim for refund, the service issued its notice of disallowance, and, within two years of receipt of the notice of disallowance, plaintiff filed this suit for refund.

The government in this case has made a number of concessions with respect to plaintiff's claim. First, the government has conceded that the plaintiff was entitled to deduct its proportionate share of the loss attributable to the cash portion of the payments made to Galaxy for the drilling obligations.[4] The government contends, however, that any such deduction would be limited to the plaintiff's basis in its partnership interest, and the amount of such basis is an unresolved issue. The government has also retracted its attack on the allocation of the total purchase price between the leasehold costs and the drilling costs.

■ The disputed issues which this court is called upon to decide evolve from the nonrecourse liability which McNeill Street/Midwest incurred in purchasing the leasehold properties and the drilling obligations from Galaxy. Briefly stated, the government argues that: (1) the liability to Galaxy was contingent and, therefore, under the applicable "all-events" test, the deduction for such liability was improperly accrued in 1972 by McNeill Street; and (2) plaintiff's basis in its partnership interest could not be increased by its proportionate share of the nonrecourse liability under the doctrine of *Crane v. Commissioner of Internal Revenue*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947).[5]

## I. The Accruability of McNeill Street's/Midwest's Liability to Galaxy Under the All-Events Test

■ The general principles which are applicable in resolving this issue are well-established. The test for determining whether a liability may be accrued in a particular year is the so-called "all-events" test. This test provides that an item may be deducted in the year in which all events necessary to determine both the fact and the amount of liability have occurred, *United States v. Anderson*, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926); *Subscription Television, Inc. v. Commissioner of Internal Revenue*, 532 F.2d 1021 (5th Cir. 1976); *Lawyers' Title Guaranty Fund v. United States*, 508 F.2d 1 (5th Cir. 1975); *W. S. Badcock Corp. v. Commissioner of Internal Revenue*, 491 F.2d 1226 (5th Cir. 1974); *see also* Treas. Reg. § 1.446–1(c) 1(ii) and § 1.461–1(a)(2) (1956). As a general rule the existence of a contingency in the taxable year with respect to a liability or its enforcement prevents accrual. Accrual of a deduction item is permitted only in the taxable year when the obligation to pay it is unconditionally fixed, *Trinity Construction Corp. v. United States*, 424 F.2d 302, 305 (5th Cir. 1970); *see also Gillis v. United States*, 402 F.2d 501 (5th Cir. 1968).

■ Applying these basic principles, the government argues that McNeill Street's liability to Galaxy, as represented by the nonrecourse promissory note, was contingent upon the production of oil and gas from the wells drilled by Galaxy, the principal security for such liability. In support of this proposition, the government cites a case which involved an analogous situation, *Sunburst Oil & Refining Co. v. Commission-*

---

claim based solely on the issues presented in this case, *i. e.*, the propriety of the loss deductions attributable to the intangible drilling costs.

3. The question of whether the plaintiff has paid such interest is unresolved. The parties have agreed to enter an appropriate judgment with respect to the interest, depending on the court's determination of the issues in this case.

4. The initial basis for disallowing the cash portion of McNeill Street's payment to Galaxy was the lack of a bona fide business purpose for the large cash payment in 1972 where the wells were not to be drilled until the following year.

5. The tax law to be applied in resolving these issues is as it existed in 1972. The changes in such law by the Tax Reform Act of 1976, see I.R.C. § 465, are not of retroactive application.

er, 23 B.T.A. 829 (1931).[6] In *Sunburst Oil*, the court found that the taxpayer's liability for expenses of drilling and operation was contingent since payment was to be made solely from the taxpayer's share of production from the wells drilled. The court held that liability could only be accrued "if and when sufficient oil was produced from the wells to pay for it." *Id.* at 836. Although the lease purchase and turnkey drilling agreement in the present case differs from the agreement in *Sunburst Oil* in that payment of the drilling price itself was not expressly made conditional upon production, the court does not believe that this distinction is controlling. In deciding whether the liability was contingent an examination must be made of all the related documents which were executed by the parties to the transaction, including the purchase agreement, the promissory note, and the security agreement, *see Subscription Television, Inc. v. Commissioner*, 532 F.2d at 1027. Under these agreements, Galaxy's sole recourse for nonpayment was against the collateral, principally the future production of any oil and gas wells. Thus, like the fact situation in *Sunburst Oil*, the liability in this case was contingent upon the possible future oil and gas production from the wells drilled by Galaxy.[7]

Moreover, Pace, a general partner in McNeill Street and the principal negotiator of the transaction, flatly testified that the wells had to be good before Galaxy would be paid on the note. If the wells had been dry, according to Pace, Galaxy would not have received all of their money on the note. This testimony substantiates the

government's contention that the liability was contingent upon production from the oil and gas wells.

■■■ In sum, the court concludes that the liability of McNeill Street to Galaxy was contingent, and that in 1972, the year of the deduction, the events necessary to determine both the fact and amount of liability had not transpired. This contingency, the future oil and gas production, was not a normal risk of collection inherent in a commercial credit transaction, *see W. S. Badcock Corp. v. Commissioner of Internal Revenue*, 491 F.2d 1226 (5th Cir. 1974). An examination of the substance of the transaction, as opposed to its form, clearly reveals that the only event which would trigger McNeill Street's liability was the future oil and gas production. If the drilling efforts proved to be unsuccessful, McNeill Street would in fact be no more liable to Galaxy for any further amounts than if it had never entered the lease purchase and turnkey drilling agreement. In each case involving application of the all-events test, a factual determination is required, dependent upon and determined by the facts of the individual case, *Subscription Television, Inc. v. Commissioner*, 532 F.2d at 1027. The factual determination and the legal conclusion drawn therefrom in this case is that McNeill Street's liability was contingent. Accordingly, since McNeill Street could not properly accrue the liability in 1972, and hence, its deduction for the intangible drilling costs represented by the amount of that liability, it follows that plaintiff's share of the loss attributable to such liability could not be deducted in the same year.

---

**6.** It is interesting to note that Mertens in his treatise cites the *Sunburst Oil* case as his principal example of a contingent liability, not accruable under the all-events test, *see* 2 J. Mertens, *Law of Federal Income Taxation* § 12.91, at 363 (rev. ed. 1974).

**7.** The plaintiff has also attempted to distinguish *Sunburst Oil* on the basis that it was decided before *Crane v. Commissioner*. The facts in *Sunburst Oil*, however, did not raise any *Crane*-related problems of nonrecourse liability. Although the contingent nature of the liability may be involved in deciding both issues presented in this case, the court believes that,

analytically, the two issues should be treated separately, namely: (1) was the liability accruable as an intangible drilling costs deduction by the partnership in 1972 under the all-events test; and (2) whether the liability may be included in the basis of plaintiff's partnership interest under the applicable principles of *Crane*. The court does recognize that *Sunburst Oil* is a relatively old case, and that there may be a trend toward a more liberal rule in permitting the accrual of expenses, *see J. Mertens, supra*, § 12.91, at 362 n.4.2. The rationale in *Sunburst Oil*, however, still appears to be sound.

## II. Plaintiff's Basis in its Partnership Interest

 In order to deduct any losses which were "passed-through" to the plaintiff, it was necessary that the basis in its partnership interest be of an amount equal to or greater than the amount of the deduction. I.R.C. § 704(d) provides generally that no loss shall be recognized to a partner in excess of his basis in the partnership. Plaintiff's basis would include its $25,000 cash contribution to McNeill Street. In addition, Treas.Reg. § 1.752–1(e) (1956) provides:

> In the case of a limited partnership, a limited partner's share of partnership liabilities shall not exceed the difference between his actual contribution credited to him by the partnership and the total contribution which he is obligated to make under the limited partnership agreement. However, where none of the partners have any personal liability (as in the case of a mortgage on real estate acquired by the partnership without the assumption by the partnership or any of the partners of any liability on the mortgage) then all partners, including limited partners, shall be considered as sharing such liability under § 752(c) in the same proportion as they shall profits.

Thus, under this regulation, a limited partner may increase his basis by the amount of his share of any nonrecourse liability incurred in the partnership's business. The increase in basis is proper, however, only if the requirements of the *Crane* doctrine regarding nonrecourse liability and related case law have been met. In making this determination, the court agrees with the parties that the transaction should be viewed as it existed in 1972, and should not be affected by subsequent events. The court concludes that upon examination of the *Crane* doctrine and related case law, the plaintiff was not entitled to increase the basis in its partnership interest by the amount of its share in the nonrecourse lia-bility, because (1) the liability was contingent; and/or (2) plaintiff has failed to prove that the value of the property securing the debt was equal to or greater than the amount of such debt.

### [A] Contingent Liability

A number of cases have established that before the *Crane* doctrine is applicable, the court must first examine the nature of the transaction in order to determine whether the liability is unconditional, *i. e.*, not contingent, *see Rodman v. Commissioner of Internal Revenue*, 542 F.2d 845 (2d Cir. 1976); *Denver & Rio Grande Western R.R. Co. v. United States*, 505 F.2d 1266, 1269–70, 205 Ct.Cl. 597 (1974); *Marcus v. Commissioner*, T.C. Memo. 1971–229 (1971); *Lemery v. Commissioner of Internal Revenue*, 52 T.C. 367, 377–78 (1969), *aff'd on another issue*, 451 F.2d 173 (9th Cir. 1971); *Mayerson v. Commissioner of Internal Revenue*, 47 T.C. 340, 353–54 (1966); *Columbus & Greenville Railway Co. v. Commissioner of Internal Revenue*, 42 T.C. 834, 848–49 (1964), *aff'd per curiam*, 358 F.2d 294 (5th Cir. 1966); *Albany Car Wheel Co. v. Commissioner of Internal Revenue*, 40 T.C. 831, 839 (1963), *aff'd per curiam*, 333 F.2d 653 (2d Cir. 1964); *Redford v. Commissioner of Internal Revenue*, 28 T.C. 773, 777 (1957). These cases hold that an obligation, which is too contingent and speculative, should not be included in cost basis, irrespective of the possible application of the *Crane* doctrine. In a sense, the nature of the inquiry is similar to the all-events test used for accrual tax accounting purpose, although none of the above-cited cases make reference to that test.[8]

In *Lemery*, 52 T.C. at 367, the taxpayer purchased a business, giving as part of the consideration the right for the seller to receive $44,335 out of the "net profits" of the business in return for seller's covenant not to compete. In deciding that the covenant had no basis for purposes of amortization, the court stated:

---

**8.** Perhaps the reason for the inapplicability of the all-events test in making this inquiry is that the question of including liability in basis applies to both cash-basis and accrual-basis tax-payers. One writer has suggested, however, that the proper standard would be the "all-events" test, *see* Landis, Liabilities and Purchase Price, 27 *Tax. Lawyer* 67, 68 (1974).

It is respondent's position that the obligation was contingent and indefinite and, therefore, not part of the cost basis for amortization purposes, . . . . Petitioners agree that a contingent liability is not part of the basis for amortization but contend that here, although *payment* of the obligation was contingent on the 'net profit' earned by the business, the *liability* created by the purchase agreement was not contingent, and that the cost of the property includes the amount of such liability even though no payments were made to discharge it, citing *Crane v. Commissioner* . . . . The difficulty with petitioners' contention is that although the stock purchase agreement states the overall purchase price to be $1,131,000 of which $646,664.83 represented mortgages and other indebtedness which the corporations themselves were obligated to pay and $40,000 was paid by the petitioners in cash, the remaining $444,335.17 which included the $200,000 assigned to the covenant was to be paid *only* out of 'net profit' of the companies. There was no provision that this balance or any portion thereof was to be paid by petitioners if the companies did not show a 'net profit.' Under these circumstances we think the obligation, as well as the payment, was contingent.

52 T.C. at 377–78. Similarly, in the *Redford* case, the amount of a note was not includable in basis since the note was only payable from profits, an uncertainty which made the liability contingent.

Reference should also be made to the *Denver & Rio Grande Western R.R. Co.* case. In that case, the taxpayer sought to include in its cost basis for a spur line the amount of a loan whose payment was to be made from 32 percent of the proceeds of shipping on the spur line above 100,000 tons per year for a period of ten years. In finding that the taxpayer's obligation was contingent, the court stated:

As a general rule the Code provides in § 1012 that the basis of property to a taxpayer is its cost. The basis of property includes not just the taxpayer's equity, but also liabilities assumed or encumbering the property acquired. *Crane v. Commissioner,* . . . .

In the present case, the Railroad [Taxpayer] is attempting to increase its investment credit and depreciation deductions by including as part of its cost basis TGS' advances for the spur line which it might never have to repay. The defendant argues that plaintiff cannot include such liability in its basis for the spur line because of its highly contingent nature.

. . .

It does not matter what the parties' subjective intentions were. Absent a binding obligation on the Railroad's part to repay all of TGS' advances at the time the investment credit and depreciation deductions were taken we deem it impossible to value the obligations assumed. The Railroad's obligation to repay was contingent upon TGS' (1) shipping a sufficient volume from its Moab, Utah, mine, and (2) within ten years of the time. Innumerable happenings could prevent that which was intended by the parties from becoming a reality . . . . .

505 F.2d at 1269–70.

The rationale of the above-referenced cases dictate the result in the present case. When the purchase agreement and the security agreement are read together, it is apparent that a contingency exists for McNeill Street's liability on the promissory note. Payment on the note, and under the purchase contract, depended upon the quantities of oil and gas production from the purchased properties. Absent such production McNeill Street had no binding legal obligations to pay the liability. The court can not accept the taxpayer's argument that by "cross-collaterizing" the five different leases, the contingency of production would be sufficiently reduced to allow the nonrecourse liability to be included in plaintiff's basis. *See* Danber, *Oil and Gas for the Passive Investor—Tax and Business Considerations,* 25th SW. Legal Foundation Ann. Inst. on Oil and Gas L. & Tax. 419, 454–58 (1974), wherein the author makes a similar argument. Whether the leases are viewed collectively or individually, the evi-

dence does not establish any reasonable certainty that oil and gas production wou.d occur because five wells were drilled as opposed to one. Nor can this case be distinguished on the basis that the obligation was not made contingent by the terms of the purchase agreement, *see Bolger v. Commissioner*, 59 T.C. 760, 771 (1973). All the documents to the transaction must be viewed together in order to determine its economic nature.

It follows, therefore, that due to the contingency inherent in McNeill Street's liability to Galaxy, the plaintiff could not increase its basis in the partnership to include its share of the nonrecourse liability.

### [B] *Value of the Property Securing the Debt*

 Even if a nonrecourse liability is not contingent, the taxpayer who seeks to invoke the principle of the *Crane* case must still show that the value of the property securing the nonrecourse debt is equal to or greater than the amount of the debt, *see Crane v. Commissioner of Internal Revenue*, 331 U.S. 1, 14 n.37, 67 S.Ct. 1947, 91 L.Ed. 1301 (1947); *Estate of Franklin v. Commissioner of Internal Revenue*, 544 F.2d 1045, 1048 (9th Cir. 1976); 3A *J. Mertens, supra* § 21.11, at 42–43; *see also* Adams, *Exploring the Outer Boundaries of the Crane Doctrine; An Imaginary Supreme Court Opinion*, 21 Tax.L.Rev. 159, 165–66 (1966). The basic underlying rationale of *Crane* is that a liability should be included in basis, even if the taxpayer has no personal liability because the taxpayer can be expected to satisfy the liability rather than lose the property. This assumption is true only if the property's value is equal to the amount of the debt. If the value of the property is less than the amount of the nonrecourse debt, it can not be assumed that the taxpayer will necessarily make full payment, or treat the liability as if it were his own. In addition, I.R.C. § 752(c) reinforces this concept:

(c) Liability to which property is subject—For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.[9]

The plaintiff taxpayer has conceded that the nonrecourse debt could have been included in its basis only if there was adequate security for such debt.

 The property, which secured McNeill Street's liability to Galaxy, was the oil and gas leases, any operating equipment on the leases owned by the mortgagor, and eighty percent of all hydrocarbons produced by any completed well on the leases. Plaintiff has proved that, in 1972, the value of the leases was $63,500, but has failed to prove any value, as of the same year, with respect to the operating equipment or future oil and gas production. The amount of the nonrecourse debt was $660,000. Therefore, under the *Crane* doctrine, the debt should not be included as a part of plaintiff's basis.[10]

---

9. One court has recently cast doubt on the view that § 752(c) is a codification of the *Crane* doctrine, see *Tufts v. Commissioner of Internal Revenue*, 70 T.C. 756 (1978). That case is distinguishable from the present case. The issue presented in *Tufts* was whether the "amount realized" in a sale included the amount of nonrecourse debt above the value of the sold property. For that inquiry, the court may consider both the economic and tax benefits to the taxpayer. On the other hand, in determining whether to include a nonrecourse debt in basis, the tax benefit aspects of the transaction have no bearing on the issue. *See* Adams, *supra*, at 169–70. In fact, the court in *Tufts* acknowledged that it was not passing upon the issue of whether nonrecourse liabilities in excess of the

fair market value of the property securing such liabilities should be included in basis.

10. The court also believes that the plaintiff's share of the nonrecourse liability up to the amount of $63,500 (the fair market value of the leases in 1972) can not be included in its basis. In order to keep those leases, McNeill Street would have to pay the entire liability ($660,-000), not just the sum of $63,500. It is unlikely, under those circumstances, that McNeill Street would treat the obligation as if it were its own, even for the sum of $63,500. *See* generally Adams, *supra*, at 165. Furthermore, the court has found that the entire liability was contingent both for purposes of accrual by the partnership, and for determination of plaintiff's basis.

In an attempt to overcome this deficiency in proof, plaintiff has argued that the price of the drilling obligations should be added to the established value of the secured properties. The court has found that the price of the drilling obligations ($1,036,500) was not unreasonable. If it could be assumed that drilling alone would add value to the secured properties commensurate with the price of that drilling, then plaintiff's contention would be correct. If this assumption could be made, after drilling the properties which secured the debt would have a value in excess of that debt. McNeill Street would then treat the obligation as if it were its own. This assumption, however, cannot be made. Pace testified that once the wells were drilled, the price of the drilling obligations had no bearing on the value of the secured properties. After drilling, the value of the leases would depend on the possible production which resulted from the drilling efforts. The drilled wells would add no value to the leases, apart from any discovered oil and gas reserves.[11]

The plaintiff has also contended that the court should consider the value of the drilling obligations in determining the adequacy of the security, irrespective of the value added to the leases by such drilling. Even assuming the value of such obligations, the court believes that this contention is erroneous. The fallacy in this contention is that Galaxy's drilling obligations did not serve as incentive for McNeill Street to pay its nonrecourse liability. The liability was to be paid after Galaxy had drilled the wells. The obligations having been performed by Galaxy at that point in time, McNeill Street would stand to lose only the leases, the operating equipment, and any oil and gas production from those leases. Continued ownership of those properties, not the drilling obligations, would serve as the only incentive for McNeill Street to treat the obligation as its own.

Nor does the court find plaintiff's citation of *Millar v. Commissioner of Internal Revenue*, 67 T.C. 656 (1977), aff'd, 577 F.2d 212 (3d Cir. 1978) persuasive. In *Millar*, a coal operator formed a corporation for purposes of conducting strip mining operations, and transferred certain coal leases he owned to the corporation. The stock was issued to members of his family and to close business associates without any payment being received. Thereafter, the operator borrowed sums of money ($500,000), and in turn, loaned these funds to the stockholders on a nonrecourse basis, the shares of the corporation being the collateral. The shareholders contributed the $500,000 to the corporation. At a later date, the operator foreclosed on the loans and obtained the stock. The question presented to the Tax Court was whether the shareholders had received any gain on the foreclosure. The resolution of this issue in turn required a determination of the shareholders' basis in their stock. The value of the stock was apparently of lesser amount than the amount of the shareholders' debt. In finding that the basis of the stock did not depend on its value, the court did not hold that a nonrecourse liability may be included in basis even though the value of the secured property is less than the amount of the debt. It simply ruled that the shareholders could increase their basis by the amount of funds actually contributed to the corporation, as evidenced by the following statement:

> The term 'adjusted basis' is defined by the statute. Neither the statute nor the *Crane* case would deny the petitioners the right to increase their basis in this stock on account of the amounts contributed, *regardless of the source of the funds.* See § 1.118–1, Income Tax Reg.

*Id.* at 660 (emphasis added). *See also Lackey v. Commissioner*, (CCH) T.C. Memo. 1977–213, at 902 (1977). The *Millar* decision, thus, does not support plaintiff's position in this case.

---

11. The fact that one well turned out to be successful is not relevant to this court's inquiry. The transaction must be viewed as it existed in 1972, *see* Treas.Reg. § 1.611–2 (1960).

The court searches not for "iron-clad guarantees" of payments, the government's position as characterized by the plaintiff, but instead, for a reasonable basis for concluding that payment would be made, as the events existed in 1972. If plaintiffs had proved that the value of the secured properties, by a demonstrably reasonable estimate, see *Estate of Franklin v. Commissioner of Internal Revenue*, 544 F.2d at 1048, equalled the amount of the nonrecourse liability to Galaxy, then the plaintiff's share of such liability could have been included in its partnership basis. The court realizes that, given the nature of the oil and gas business, such evidence may be difficult to prove, if not impossible. If that be the case, the court can only respond by stating that the *Crane* doctrine does not establish an "iron-clad guarantee" that all nonrecourse liabilities may be included in a taxpayer's cost basis.

### III. The Equity Aspects of McNeill Street's Nonrecourse Debt to Galaxy

An argument can also be made in this case that Galaxy's purported loan to the McNeill/Midwest joint venture represented not a bona fide debt, but an equity interest in such venture. The facts which would support such conclusion are: (1) the initial cash outlay for the drilling obligations approximated Galaxy's own estimated out-of-pocket drilling costs; (2) the principal security for the debt was to be out of the future oil and gas production from the drilled wells; and (3) Galaxy's right under the loan agreement to enter into a completion joint venture with the partnership.

In Rev.Rul. 72–330, 1972–2 Cum.Bull. 394, the Service was presented with the following situation. An unrelated party loaned

certain sums of money to a partnership which was engaged in the oil and gas exploration business. The loan was made on a nonrecourse basis, the debt being secured by the unproven leases and some expensive but unsalvageable oil and gas well installations. The lender had the right to convert the loan into a twenty-five percent interest in the partnership profits. The Service ruled that the "debt" was not a debt, but instead represented an equity interest in the venture. Thus, the bases of the partnership interests of the other parties under I.R.C. § 705 were not affected.

Although this ruling is not binding on the court, its significance is highlighted by the Fifth Circuit's decision in *Backar v. Western States Producing Co.*, 547 F.2d 876 (5th Cir. 1977). The court was presented with a transaction which was in all respects identical with the one in the present case. After describing the details and aspects of such transaction, the court stated in a footnote:

> The Internal Revenue Service has ruled that in a similar transaction in which an investor 'loaned' an oil and gas limited partnership funds in return for nonrecourse notes and security interests in unproven oil and gas leases the 'loan' was not a bona fide debt but a capital investment by the investor in the venture. Rev.Rul. 72–350, 1972–2 C.B. 394. *Western States' [driller/seller] 'loan' to Comprehensive [purchaser] is indistinguishable.*

*Id.* at 880 n.3 (emphasis added). Admittedly, the *Backar* case dealt only with the nontax aspects of the transaction.[12]

Thus, the court could conclude, in light of the economics of this transaction, that the debt to Galaxy was not in fact a debt, but an equity interest in the McNeill/Midwest

---

12. In a report by the Joint Committee on Internal Revenue Taxation, the Committee, in discussing the oil and gas tax shelters, stated:

> As indicated above, it is not clear, even under present law, that taxpayers are entitled to all the deductions which are sometimes claimed in connection with the oil and gas drilling funds.

*(P-H) Handbook on Tax Shelters, as Described by the Joint Committee on Internal Revenue*

*Taxation* 36 (April 22, 1976). In the supporting footnote, the report stated:

> For example, there may be questions as to whether nonrecourse loans made to the partnership should be treated as debt, which may be used to increase the basis of limited partners, or an equity investment by the lender, which may not be so used.

*Id* at n.9

joint venture. In light of the court's resolution of the other issues in this case and the parties' relative inattention to the debt/equity issue, the court declines the opportunity to base its decision on this issue.

### Summary

To summarize, the court has made the following rulings with respect to the issues raised by this case:

(1) McNeill Street improperly accrued in 1972 its share of the nonrecourse liability to Galaxy and the resulting intangible drilling deductions, because the requirements of the all-events test for accrual accounting purposes were not satisfied in that year. Plaintiff, therefore, could not deduct in the same year any loss attributable to such liability.

(2) Plaintiff was not entitled to increase the basis of its partnership interest for its proportionate share of the nonrecourse liability, because (a) the liability was contingent; and/or (b) plaintiff has failed to prove that the value of the properties securing the debt equalled the amount of the debt.

(3) Plaintiff was entitled to deduct its share of any losses resulting from McNeill Street's cash payments for Galaxy's drilling obligations, limited to its basis in its partnership interest, $25,000.

The defendant is directed to submit a proposed judgment, approved as to form by plaintiff, which reflects the holdings of this opinion.

It is so ORDERED.