John F. TUFTS and Mary A. Tufts, et al., Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 79–2258.

United States Court of Appeals, Fifth Circuit.
Unit A

July 27, 1981.

Rehearing and Rehearing En Banc Denied Oct. 19, 1981.

Ronald M. Mankoff, Dallas, Tex., for petitioners-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Michael L. Paup, Atty., Gilbert E. Andrews,

---

Act. Chief, Appellate Section, Gilbert Rothenberg, Appellate Section, Tax Div., U. S. Dept. of Justice, Lester Stein, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent-appellee.

Before BROWN, THORNBERRY and WILLIAMS, Circuit Judges.

THORNBERRY, Circuit Judge:

In August 1970, John Tufts and the remaining appellants formed a general partnership for the purpose of constructing an apartment complex in Duncanville, Texas. The partnership arranged for a loan of approximately $1.8 million in order to finance construction of the complex. The mortgage note covered the entire cost and provided that neither the partnership nor the partners were personally liable for its repayment. The complex was completed in August 1971. Due to adverse economic conditions in the Duncanville area, the income generated by the complex was never enough to enable the partnership to make payments on the mortgage principal. As of August 28, 1972, the fair market value of the property had declined to $1.4 million, and the principal balance due on the mortgage note remained at $1.8 million. On that date, each partner sold his partnership interest and all of his right, title, and interest in property owned by the partnership to Fred Bayles, an unrelated third party.[1] Mr. Bayles agreed to pay the expenses incurred by the partners as a result of the sale, up to $250. He paid no other consideration, and acquired the complex subject to the nonrecourse liability.

Each partner had included his proportionate share of the entire $1.8 million in computing his basis in the partnership, and the Commissioner did not dispute the propriety of that computation. The Commissioner, however, included the full amount of the partnership nonrecourse liability in the amount realized upon the sale and therefore determined that each of the partners had realized a gain on the sale of his partnership interest.[2] The partners appealed to the tax court, arguing that nonrecourse liabilities should be included in amount realized only to the extent of the fair market value of the partnership property securing the indebtedness. The tax court upheld the Commissioner, and the taxpayers filed this appeal.

The Supreme Court held in *Crane v. Commissioner*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), that when property subject to a mortgage on which the owner of the property assumes no personal liability is sold, the amount realized includes the amount of the unassumed mortgage.[3] In footnote 37

1. I.R.C. § 741 provides that gain or loss from the sale or exchange of an interest in a partnership shall be considered as gain or loss from the sale or exchange of a capital asset, except *as otherwise provided in I.R.C. § 751* (relating to unrealized receivables and inventory items which have appreciated substantially in value.

2. I.R.C. § 1001 provides in part:
   (a) COMPUTATION OF GAIN OR LOSS.— The *gain* from the sale or other disposition of property shall be the excess of the *amount realized* therefrom over the *adjusted basis* provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.
   (b) AMOUNT REALIZED.—The *amount realized* from the sale or other disposition of property shall be *the sum of any money received plus the fair market value of the property (other than money) received.*

(emphasis added).

3. Mrs. Crane inherited an apartment building worth $250,000, subject to a nonrecourse mortgage *in the same amount, held it for seven* years, and sold it, subject to the unamortized mortgage, for $2500 in cash. She reported a gain of $2500 on the sale, arguing that the *property she had acquired from her husband's* estate was only the equity in the building (which under I.R.C. § 1014 entitled her to a basis of zero), and that the amount realized for the equity when she sold it was $2500. The Supreme Court rejected her argument, holding that the property inherited by Mrs. Crane was not merely the equity, but the real estate (which under § 1014 had an unadjusted basis of $250,000), and that the amount realized on the sale also included the full amount of the nonrecourse debt.

of the *Crane* opinion, however, the Court observed:

> Obviously, if the value of the property is less than the amount of the mortgage, a mortgagor who is not personally liable cannot realize a benefit equal to the mortgage. Consequently, a different problem might be encountered where a mortgagor abandoned the property or transferred it subject to the mortgage without receiving boot. That is not this case.

331 U.S. at 14 n.37, 67 S.Ct. at 1054. The question presented by this appeal is whether footnote 37 creates an exception to the *Crane* holding through its clear implication that the amount realized on the disposition of property encumbered by a nonrecourse mortgage cannot exceed the fair market value of the property. Our analysis of the reasons underlying the *Crane* decision leads us to the conclusion that such a fair market value limitation is warranted. We therefore reverse the judgment of the tax court.

The Commissioner relies primarily on the decision in *Millar v. Commissioner*, 577 F.2d 212 (3rd Cir.), *cert. denied*, 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 704 (1978). The *Millar* court rejected a literal reading of footnote 37 in view of what it thought to be the principal reason underlying the *Crane* decision. The court focused on the following language:

> The crux of this case, really, is whether the law permits her to exclude allowable deductions from consideration in computing gain. We have already showed that, if it does, the taxpayer can enjoy a double deduction, in effect, on the same loss of assets.

557 F.2d at 215, *quoting Crane*, 331 U.S. at 15–16, 67 S.Ct. at 1055. According to the *Millar* panel, the Supreme Court was primarily concerned that the taxpayer might enjoy some sort of double deduction. The tax court below, as well as the Commission-

er on appeal, agreeing with *Millar*, also identified this concern for double deductions as the principal reason for the *Crane* holding. They invoke the *Crane* double deduction language in support of a tax benefit theory: the argument, in essence, is that a taxpayer who has previously enjoyed the benefit of large tax deductions, without placing his own assets at risk, has, by taking those deductions, improved his economic position, thus realizing gain. According to the Commissioner and the tax court, the taxpayer, on disposing of the property, must somehow be made to account for the benefits previously enjoyed.

We do not agree that this concern for double deductions was the principal reason underlying the *Crane* decision. The *Crane* language leaves no doubt that the Court thought that Mrs. Crane had improved her financial condition by availing herself of the allowable deductions. But before the Court had even mentioned double deductions, it had already concluded that the Commissioner had properly determined the amount realized. *After* reaching that conclusion, the Court acknowledged the distinction between statutory income (that which Congress has decided to reach through legislation) and constitutional income (that which Congress has the power to reach, if it chooses to do so). Mrs. Crane had argued in the alternative that she had been taxed on what was not income within the meaning of the sixteenth amendment. The Court responded to this constitutional argument in the last paragraph of its opinion, and in that last paragraph the Court for the first time expressed concern for double deductions. We therefore prefer to read this expression of concern as primarily a response to Mrs. Crane's constitutional argument, and not as the principal justification for the statutory holding that the Court had announced earlier in the opinion.[4]

There is an even more compelling reason why the fact that a taxpayer has previously

---

4. We must confess that our preference stems in part from our uncertainty as to the exact nature of the "double deductions" that concerned the Court. The Court apparently was endorsing the reasoning of Judge Learned Hand, the

author of the opinion in the Court of Appeals, who stated:

> By hypothesis [the taxpayer] will have been allowed deductions seriatim, based upon the actual value of the buildings; and he will in addition have got a reduction in his gain to

enjoyed the benefit of large depreciation deductions is insufficient to justify an expansion of the definition of amount realized. We see, by looking to the Internal Revenue Code, that Congress has already in fact accounted for those previous deductions. According to the Code, "gain" from the sale or other disposition of property is computed by subtracting the "adjusted basis" from the "amount realized." I.R.C. § 1001(a). The "adjusted basis" is the cost of the property adjusted to reflect the depreciation, depletion, and other costs chargeable against the property. I.R.C. § 1016. Thus, any tax benefits that the taxpayer may have received in the form of prior deductions have already been factored into the gain equation through adjustments to basis. Since those deductions have been accounted for through adjustments to basis, it follows logically that they cannot also support an expansion of the definition of amount realized. To account for those deductions twice in the same equation by expanding the definition of amount realized as well as adjusting basis downward would, we think, be taxing the taxpayer twice on the same component of gain.[5] The Commissioner's reliance on a theory of tax benefit, then, is misplaced. The Code clearly provides for a "recapture" of the prior deductions,[6] but not through its definition of amount realized.

When we look to what the Court said immediately before it announced its conclusion that the Commissioner had properly determined the amount realized, we see that the Court justified its result on a theory of economic benefit, first recognizing that the term "amount realized" could be expanded where an economic benefit equivalent to cash could be identified. The Court began by noting that if Mrs. Crane had been personally liable on the mortgage and the purchaser had either paid or assumed it, the amount so paid or assumed would clearly have been considered a part of the amount realized because Mrs. Crane would have received the benefit of the payment "in 'as real and substantial [a sense]' " as if the money had been paid to her and then paid over by her to her creditors. 331 U.S. at 13, 67 S.Ct. at 1054, *citing United States v. Hendler*, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018 (1938). That proposition and the economic principle from which it derives are indisputable: when a debt on which a taxpayer is personally liable is discharged, the taxpayer is freed from the necessity of paying the obligation with cash or other assets equal in value to the principal amount of the debt. *United States v. Kirby Lumber Co.*, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931). What the Court thought followed from that proposition, however, is worth quoting:

> Congress chose to "consider" and account for those allowable deductions through adjustments to basis, and not though an expansive definition of amount realized.

the extent to which actual "wear and tear" has reduced the selling price. Manifest justice demands that he must surrender one or the other....
*Commissioner v. Crane*, 153 F.2d 504, 505 (2nd Cir. 1945). We had always supposed that Congress chose to allow depreciation deductions on the assumption that wear and tear would diminish the value of the property. In other words, Congress decided to compensate a property owner, by allowing him to take depreciation deductions, for an expected loss in value due to deterioration of the property. We therefore do not understand why, if the property *does in fact decline in value as was expected*, "manifest justice" requires the taxpayer to somehow "surrender" the previous deductions or the gain that he never realized.

5. We note that our analysis is entirely consistent with the *Crane* language. We fully agree that the law does not permit a taxpayer "to exclude allowable deductions from consideration in computing gain." 331 U.S. at 15–16; 67 S.Ct. at 1055. We have merely concluded that

6. In fact, the Code does even more than merely recapture prior depreciation deductions actually taken by the taxpayer. Section 1016 requires that the basis of property be reduced by the amount of depreciation allowable whether or not it is taken. *Virginia Hotel Corp. v. Helvering*, 319 U.S. 523, 63 S.Ct. 1260, 87 L.Ed. 1561 (1943). Section 1016 thus operates whether or not the taxpayer has enjoyed a tax benefit via a deduction. In contrast, the tax benefit rule is designed only to prevent the taxpayer from making actual personal gains through unwarranted deductions. *See, e. g.,* I.R.C. § 111 (bad debts, prior taxes, or delinquency amounts written off in prior years must be included in income when recovered, unless the prior deduction did not reduce the tax).

[W]e think that a mortgagor, not personally liable on the debt, who sells the property subject to the mortgage and for additional consideration, realizes a benefit in the amount of the mortgage as well as the boot.[37] If a purchaser pays boot, it is immaterial as to our problem whether the mortgagor is also to receive money from the purchaser to discharge the mortgage prior to sale, or whether he is merely to transfer subject to the mortgage—it may make a difference to the purchaser and the mortgagee, but not to the mortgagor. Or put in another way, we are no more concerned with whether the mortgagor is, strictly speaking, a debtor on the mortgage, than we are with whether the benefit to him is, strictly speaking, a receipt of money or property. We are rather concerned with *the reality that an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligations.*[38] If he transfers subject to the mortgage, the benefit to him is as real and substantial as if the mortgage were discharged, or as if a personal debt in an equal amount had been assumed by another.

331 U.S. at 14, 67 S.Ct. at 1054–55 (emphasis added).

This economic benefit theory is, we think, seriously flawed, in that it is premised on the notion that "an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligations." We admit that we initially succumbed to the facile appeal of that notion, but on reflection we are convinced that it rings true only so long as the taxpayer actually wants to keep the property.[7] If the taxpayer decides, for any reason whatsoever, that he no longer wants the burdens and responsibilities that accompany ownership, he can transfer the property to a third party with absolutely no regard to that party's willingness or ability to meet the mortgage obligations, yet rest assured that his other assets cannot be reached. We agree with Professor Bittker:

> Relief from a nonrecourse debt is not an economic benefit if it can be obtained only by giving up the mortgaged property. It is analogous to the relief one obtains from local real property taxes by disposing of the property. Like nonrecourse debt, the taxes must be paid to retain the property; but no one would suggest that the disposition of unprofitable property produces an economic benefit equal to the present value of the taxes that will not be paid in the future.

Bittker, *Tax Shelters, Nonrecourse Debt, and the* Crane *Case*, 33 Tax L.Rev. 277, 282

---

**7.** Professor Bittker provides an analogy:

> The Court was, of course, right in asserting that the owner of mortgaged property must keep up the payments if he wants to retain the property and that *for this period of time*, he must treat the debt as a personal obligation whether he is personally liable or not. It does not follow, however, that the benefit to him from transferring the property subject to the mortgage is the same in both cases. If you crave gourmet meals, you must pay for them so long as your addiction continues; but once you break the habit, you need pay only for those you bought on credit in the past, not for those that you will skip in the future. So it is with mortgages. Nonrecourse obligations can be disregarded as soon as the property is sold, given away, or abandoned; personal liability persists even after the property has been disposed of, whether the new owner assumes or takes subject to the debt.

Thus, *Crane* overstates the resemblance between nonrecourse and personal obligations. Bittker, *Tax Shelters, Nonrecourse Debt, and the Crane Case*, 33 Tax L.Rev. 277, 281 (1978). Professor Bittker rejects the economic benefit theory as "wholly fallacious," but justifies the result reached by the Court on what he calls a balancing entry theory. The *Crane* decision, according to Bittker, "was justifiable because it brought the tax consequences of the taxpayer's dealings with her property into harmony with economic reality by recapturing her depreciation deductions to the extent that they exceeded her investment in the encumbered property." *Id.* at 282. Professor Bittker, then, agrees with the Commissioner that it is somehow unfair for a taxpayer to enjoy the benefit of substantial deductions without having placed his own assets at risk. As we will note, we think that argument is properly directed at the Congress, not at the courts. It may be that Professor Bittker was so directing it. *See id.* at 284.

(1978). We do not deny that Mrs. Crane received *some* benefit: a purchaser had to pay off the mortgage or at least be willing to take the property subject to the mortgage before Mrs. Crane could pocket her $2500 in equity. We do, however, seriously question whether the full amount of non-recourse debt is an accurate measure of that benefit.

Because, as indicated above, we have serious reservations about the *Crane* decision, we decline to extend it beyond the facts of that case, and we therefore conclude that

the fair market value limitation so "[o]bviously" anticipated by footnote 37 is warranted. We hold that the fair market value of the property securing a nonrecourse debt limits the extent to which the debt can be included in the amount realized on disposition of the property.[8]

REVERSED.[9]

**JERRE S. WILLIAMS, Circuit Judge, concurring:**

I concur with the result reached by our panel because the Commissioner's position is

---

8. The appellants argued in the alternative that I.R.C. § 752(c) expressly limits the amount realized from the transfer of their partnership interests to the fair market value of the property securing the nonrecourse debt. Section 752 provides in full as follows:

§ 752. Treatment of certain liabilities

(a) Increase in partner's liabilities.—Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

(b) Decrease in partner's liabilities.—Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

(c) Liability to which property is subject.—For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

(d) Sale or exchange of an interest.—In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

Notwithstanding the unambiguous language of § 752(c), the Commissioner contended that Congress intended the fair market value limitation of that subsection to apply only when encumbered property was contributed to or distributed from a partnership, and that § 752(d) somehow operates independently of § 752(c). Because § 752(c) provides for a fair market value limitation, it necessarily conflicts, according to the Commissioner, with § 752(d), which provides that liabilities associated with the sale or exchange of partnership interests are to be treated in the same manner as liabilities associated with the sale or exchange of

other property. Obviously, our holding extinguishes any conflict that the Commissioner might see in the provisions of § 752. Further, since § 752(c) is generally regarded to be an intended codification of the *Crane* doctrine, *see, e.g.,* Perry *Limited Partnerships and Tax Shelters: The* Crane *Rule Goes Public,* 27 Tax L.Rev. 525, 542 (1972), it seems that our holding is consistent with congressional understanding of the *Crane* case.

9. Because our holding is in direct conflict with decisions in other circuits, we think the following remarks are necessary to put this case in its proper perspective. First, and most important, the precise issue before this court is extremely narrow: whether the tax court properly included the full amount of nonrecourse debt in amount realized. Congress specifically defined amount realized to be the sum of any money received plus the fair market value of the property (other than money) received. I.R.C. § 1001(b). The Supreme Court has held that the definition can be expanded where an economic benefit equivalent to cash can be identified. Significantly, whether the taxpayers properly included the full amount of the nonrecourse debt in the bases of their partnership interests is not an issue in this case.

We detect in the caselaw and the literature a legitimate concern for potential abuses or at least misuses of the tax law through various tax shelter schemes. Judge Friendly recently stated:

If non-recourse mortgages contribute to the basis of property, then they must be included in the amount realized on its sale. Any other course would render the concept of basis nonsensical by permitting sellers of mortgaged property to register large tax losses stemming from an *inflated basis* and a diminished realization of gain. It would also permit *depreciation deductions in excess of a property holder's real investment* which could never subsequently be recaptured.

*Estate of Levine v. Commissioner,* 634 F.2d 12 (2nd Cir. 1980). *See also* Bittker, *supra* note 7, at 284–84. Judge Friendly has identified, we

1064

inconsistent with the plain language of I.R.C. § 1001(b) and I.R.C. § 752(c). I part company with the majority opinion because it rests on a difference of opinion with the Service over the construction of § 1001 in light of the *Crane* doctrine. I doubt that we have authority to strike down the Commissioner's interpretation on the basis of "serious reservations about the *Crane* decision." We are authorized, however, to invalidate administrative regulations that conflict with the statute on which they purport to be based.

I understand the majority's reluctance to extend the Supreme Court's approach to the taxation of nonrecourse debt cancellation taken in *Crane v. Commissioner*. Neverthe-

less, *Crane* is the law. In this case, we review the Commissioner's effort to extend the *Crane* doctrine to plug a breach in the dike holding back a potential flood of tax shelter schemes employing exaggerated depreciation and loss deduction claims grounded on nonrecourse financing-inflated basis. The majority opinion discusses this "potential for abuse" inherent in our ruling, n.9 *supra*, yet concludes that the Commissioner's proposed solution, reflected in Treas. Reg. § 1.1001–2(b) (1980), constitutes an unacceptable "distort[ion of] the definition of amount realized."

With admiration for the logical rigor exhibited in the majority's analysis of this

think, the two primary concerns that could prompt a decision like *Millar*. The first is that taxpayers will be able to use nonrecourse financing to inflate their bases in order to enjoy the benefit of large tax deductions that bear no relationship to actual economic loss. The second appears to be nothing more than a concern for fairness. The argument, we suppose, is that it is somehow unfair for a taxpayer to enjoy the benefit of substantial deductions without having invested his own funds or placed his own assets at risk.

We agree that there exists a potential for abuse. But Judge Friendly also correctly identified the reason that potential exists: "non-recourse mortgages contribute to the basis of property." The real crux of the problem, then, is the taxpayer's ability to manipulate his basis and adjusted basis through the use of nonrecourse financing. The solution, in our opinion, is to deal directly with the definitions of "basis" and "adjusted basis," either judicially or through legislation. *See, e.g., Gibson Products Co. v. United States*, 460 F.Supp. 1109 (N.D. Tex.1978) (nonrecourse indebtedness in excess of fair market value of the property securing the debt cannot be included in basis), *affirmed*, 637 F.2d 1041 (5th Cir. 1981); *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976). It is not a solution to distort the definition of amount realized by finding an economic benefit equivalent to cash where none exists. There is simply no relationship between basis, adjustments to basis, and amount realized, except where Congress has specifically legislated for recapture. In response to the notion that it is unfair for a taxpayer to enjoy the benefit of substantial deductions on property acquired with nonrecourse funds, we need only state that Congress knows how to limit deductions to amounts that the taxpayer actually places at risk, *see, e.g.,* I.R.C. § 465, and has not yet done so under the circumstances of this case.

Finally, we must respond to Judge Williams' thoughtful concurring opinion. We do not think that the fair market value limitation in I.R.C. § 1001(b) applies to this case. Judge Williams characterizes the release of nonrecourse indebtedness as "property (other than money) received" within the meaning of that section. *Crane* expanded the definition of amount realized to include economic benefits equivalent to cash. In our view, intangible cash equivalents are more akin to "money" than to "property." But even if Judge Williams is correct in this regard, we are troubled by his application of the freeing-of-assets theory. That theory makes perfect sense in the case of recourse indebtedness: when recourse indebtedness is assumed or extinguished, other assets are "freed" in the sense that the seller no longer faces the prospect of losing them to his creditor. In contrast, it seems that property subject to nonrecourse indebtedness is in no sense "freed" but is actually "lost" when transferred subject to or relinquished in satisfaction of the debt. Further, we do not agree with Judge Williams' conclusion that the fair market value of the release "corresponds directly" with the fair market value of the property securing the nonrecourse indebtedness. As we noted in the text, Mrs. Crane benefited in that a release was a prerequisite to recovery of her $2500 equity. The fair market value of the release is a measure of that benefit. But because we remain unpersuaded that Mrs. Crane, in recovering her equity, "benefited" to the extent of $255,000, we think the fair market value of the release must be something substantially less.

We do agree with Judge Williams that whether we need only give great weight to the Commissioner's position or whether we may reject it only if it is unreasonable makes no difference. Because of our reservations about the logical underpinnings of *Crane*, we think that an extension of it would be unreasonable.

problem, I think it is essential to take heed of the constraints our Court operates under when we review an aspect of the intricate enforcement mechanism devised by the Internal Revenue Service to administer the tax laws. If we ignore the adoption of Treas.Reg. § 1.1001–2(b) during the pendency of this appeal [1] and the position asserted by the Internal Revenue Service as merely an administrative interpretation, our Court is obliged to give great weight to the Commissioner's position. *Compare United States v. Fisher,* 353 F.2d 396 (5th Cir. 1965) (appellate court is obliged to give "great weight" to Treasury Department's administrative construction of the National Firearms Act). If, on the other hand, we recognize that the Commissioner's interpretation before us on this appeal has now been elevated to the status of a regulation, we may invalidate it "only if it is unreasonable and inconsistent with the statute." *Delta Metalforming Co., Inc. v. Commissioner of Internal Revenue,* 632 F.2d 442, 449 (5th Cir. 1980) (per Judge Brown). In matters of tax code construction and administration, we must bear in mind that "[t]he choice among reasonable interpretations is for the Commissioner, not the Courts. *National Muffler Dealers Ass'n, Inc. v. United States,* 440 U.S. 472, 488, 99 S.Ct. 1304, 1312, 59 L.Ed.2d 519 (1979). Whether we regard the view advanced by the Commissioner on this appeal as a mere interpretation or a regulation makes no difference. In this case, the plain language of the statute conflicts with the Service's position.

Reliance on the literal language of the tax code is a precarious position, especially when dealing with *Crane*-like situations.[2] Nevertheless, it seems apparent to me that the question left dangling by footnote 37 of *Crane* is squarely answered by I.R.C. § 1001(b), which defines "amount realized" as "the sum of any money received plus the *fair market value* of· the property (other than money) received" (emphasis added). Although the Supreme Court expressly avoided characterizing the taxable economic benefit a transferor of property receives when his transferee takes subject to a nonrecourse mortgage as either money or property, 331 U.S. at 14, 67 S.Ct. at 1054, Judge Learned Hand in the same case in lower court declared "it is the law . . . that . . . the release [of nonrecourse indebtedness] would have been 'property (other than money) received' within the meaning of § 111(b) [now I.R.C. § 1101(b)]." *Commissioner v. Crane,* 153 F.2d 504, 505 (2d Cir. 1945). Combining the freeing-of-assets theory underlying the cancellation of indebtedness cases, *see United States v. Kirby Lumber Co.,* 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931), with the *Crane* principle that recourse and nonrecourse indebtedness be treated alike under § 1001, the fair market value of the release corresponds directly to the fair market value of the property securing the nonrecourse indebtedness.[3] Therefore, § 1001(b) imposes tax liability for receipt of a release of nonrecourse indebtedness, but only to the extent of the fair market value of the property transferred subject to the nonrecourse mortgage.

The result compelled by the fair market value limitation of § 1001(b) is also compelled in this case involving partnership taxation by I.R.C. § 752(c), which inserts a parallel fair market value limitation on transfers of mortgaged property within and

---

1. Treas.Reg. § 1001–2(b) was promulgated on December 11, 1980.

2. One commentator on the *Crane* doctrine offered this admonition on tax code construction: "Everyday meanings are only of secondary importance when construing the words of tax statute and are very seldom given any weight when a more abstruse and technical meaning is available." Adams, *Exploring the Outer Boundaries of the* Crane *Doctrine; an Imaginary Supreme Court Opinion,* 21 Tax L.Rev. 159, 164 (1966).

3. This reckoning echoes the Supreme Court's language, to which Footnote 37 was appended, in *Crane:* "we .think that a mortgagor, not personally liable on the debt, who sells the property subject to the mortgage and for additional consideration, realizes a benefit *in the amount of the mortgage* as well as the boot." 331 U.S. at 14, 67 S.Ct. at 1054 (footnote omitted) (emphasis added).

by a partnership. Again, the Service's view that § 752(c) operates independently of § 752(d), *see* n.8, *supra*, is at war with the plain language of the statute. Subsection (c) applies: "[f]or purposes of this section." Subsection (d) is part of § 752—"this section." Even if one were to adopt the *Millar* view and ignore the fair market value limitation of § 1001(b), the clear and specific imposition of a fair market value limitation in § 752(c) would control over § 752(d)'s general reference to the computation embracing the § 1001 definition in the partnership taxation context. Our reading of § 1001(b) is further justified because it does not permit the development of a disparity in the taxation of partnerships as opposed to other business entities.

The result § 1001(b) and § 752(c) compel me to reach produces grave consequences for the equitable administration of the tax code. We abandon the certainty and predictability of calculations based on amounts specified in the nonrecourse mortgage instrument in favor of the elusive concept of fair market value. Under our decision, borrowers with personal liability receive less favorable treatment than nonrecourse borrowers on mortgaged property that declines in value. While I.R.C. § 465's "at risk" limitations on loss deduction from investments in certain speculative ventures may curb the potential for tax shelter abuses employing nonrecourse financing, § 465 does not reach real estate investments of the sort transferred by the Tufts partnership. Our holding means that the Internal Revenue Service—or Congress—will have to retool the code mechanism for policing exaggerated depreciation and loss deduction claims grounded on a basis inflated by nonrecourse borrowing. Section 1001 and 752 simply do not authorize the administrative solution the Service seeks to defend here.

*Crane* is correct and does not warrant a restrictive interpretation. But the Commissioner's extension of *Crane* on review here collides directly with controlling statutory language when the fair market value of the property is less than the amount of the adjusted base, i.e. the amount of the nonrecourse debt less the deductions taken.