RONALD B. AND SUZANNE B. SNYDER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Snyder v. Commissioner
Docket No. 4408-81.
United States Tax Court
T.C. Memo 1985-5; 1985 Tax Ct. Memo LEXIS 631; 49 T.C.M. (CCH) 432; T.C.M. (RIA) 85005; January 2, 1985. *631 Held: R.B.S., Inc. a Subchapter S corporation, is not entitled to deductions for depreciation on an item labeled "Miscellaneous Equipment" on its tax returns for the years 1973, 1974, 1976 and 1977. Petitioners' income as stockholders of R.B.S., Inc. increased accordingly. Held, further: A substantial part of each understatement of tax liability for petitioners' taxable years 1973, 1974, 1976 and 1977 was due to fraud on the part of Ronald Snyder. Additions to tax under sec. 6653(b), I.R.C., 1954, sustained against Ronald. Held, Further: Returns filed by petitioners for each of the years 1973, 1974, 1976 and 1977 were fraudulent with intent to evade tax. Statute of limitations does not prohibit assessment of tax for years 1973 and 1974. John B. Fisher, for the petitioners. Nancy B. Herbert, for the respondent. DRENNEN MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiences in and additions to petitioners' Federal income tax as follows: Addition to Tax [1] *632 Year
Deficiency
Sec. 6653(b)
1973
$51,981.57
$25,990.79
1974
37,152.38
18,576.19
1976
21,744.37
10,872.19
1977
29,594.07
14,497.04
The notice of deficiency was dated December 10, 1983. After concessions, the issues for decision are [2] *633 (1) whether an electing Subchapter S corporation (R.B.S., Inc.) controlled by petitioners is entitled to deductions for depreciation for the taxable years 1973, 1974, 1976 and 1977 in the respective amounts of $140,475.58, $70,237.47, $7,023.68, and $28,095.05; (2) whether petitioners are liable for the addition to tax for fraud under section 6653(b) for each of those years, and (3) whether the statute of limitations prohibits the assessment and collection of the deficiencies in and additions to petitioners' income tax for the taxable years 1973 and 1974. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulations of fact, along with the corresponding exhibits, are incorporated herein by this reference. In determining our findings herein, we have given due consideration to petitioners' objections to certain paragraphs of the stipulations of fact on the grounds of relevance. Petitioners Ronald B. Snyder and Suzanne B. Snyder, husband and wife, resided at Holly Hill, Lewisburg, West Virginia at the time they filed their petition herein. They filed joint Federal income tax returns for the taxable years 1973, 1974, 1976 and 1977 with the Internal Revenue Service Center in Memphis, Tennessee. Petitioners' returns for 1974, 1976 and 1977 were filed on or before *634 their respective due dates. Petitioners' return for 1973 was filed on September 17, 1974, within the time allowed for filing as extended. During the taxable years in issue, petitioner Ronald B. Snyder was the president and majority shareholder of R.B.S., Inc. (R.B.S.). During these years, R.B.S. elected to be treated as a "small business corporation" according to the provisions of Subchapter S of the Internal Revenue Code of 1954, sections 1371 -1379. R.B.S. had outstanding during these years a total of 2,448 shares of stock, which were issued in the following names: Shares
Percentage
Ronald B. Snyder
2,284
93.3
J. Sharon Snyder Butler
160
6.5
Suzanne Snyder
4
.2
2,448
100  Ronald B. Snyder and J. Sharon Snyder Butler are the children of Harry B. Snyder, also known and hereinafter referred to as Bennie Snyder, and Bernice Snyder, who is now deceased. R.B.S. was incorporated in 1964 in the state of Florida. Ronald B. Snyder has been the president and majority shareholder of R.B.S. since its formation. R.B.S. was formed as a vehicle through which to continue the business of Ronald's father, Bennie Snyder. From the 1940's through the mid 1960's Bennie Snyder was engaged as a sole proprietor *635 in a business involving road construction, the operation of a limestone quarry and a ready-mix concrete plant, and the manufacturing of cement blocks. A discussion of Bennie Snyder's business and the events surrounding the formation of R.B.S. is necessary to fully understand the issues herein. In connection with road construction contracts with the states of Virginia and West Virginia, Bennie Snyder was required to furnish performance and payment bonds. In 1963 he was bonded on interstate highway contracts for about $6,000,000 by United States Fidelity and Guaranty Company (USF&G). Bennie Snyder suffered substantial business losses in 1962 and 1963, and failed to perform satisfactorily on certain road construction contracts. By the summer of 1963 he was without sufficient cash flow to perform the road construction jobs on a day to day basis. Consequently, USF&G, in an effort to infuse sufficient capital into the business to complete the road contracts and curtail its own prospective losses as surety, arranged for two loans of $250,000 each to Bennie and Bernice from a bank in Charleston, West Virginia. USF&G unconditionally guaranteed the loans, which were secured by chattel trust *636 deeds on substantially all of Bennie's business machinery and equipment, deeds of trust on real estate owned by Bennie and Bernice, and an assignment of the proceeds of the road construction contracts. These loans were not sufficient to turn the business around, and by early 1964, Bennie and Bernice were insolvent. Virtually all of the machinery and equipment of the business was encumbered. USF&G controlled the completion of the road construction contracts and the proceeds derived therefrom. Among Bennie's creditors was the Internal Revenue Service, which had outstanding as of December 31, 1964 a claim of $208,568 for deficiencies in income tax and interest thereon for the taxable years 1956, 1957 and 1959. Bennie sought an alternative means to continue his business free from the demands of his creditors. Accordingly, he caused R.B.S. to be formed in March, 1964. Although it was incorporated in Florida, R.B.S. was authorized to do business in West Virginia. At the time R.B.S. was formed, petitioner Ronald Snyder was serving in the United States Army in Columbus, Georgia. He had entered the army in November, 1962, after graduating from Carnegie Mellon University, and he served *637 until his discharge in November, 1964. During summers while in college and prior to entering the army, Ronald worked for his father. Ronald's sister Sharon was in college in 1964. Ronald was designated as president of R.B.S. Bernice Snyder was designated secretary-treasurer. [3] During 1964 and 1965, common stock of R.B.S. having a total par value of $61,200 was issued to Ronald, Sharon and Suzanne as follows: Shares
Par Value
Percentage
Ronald Snyder
2,254
$57,100
93.3
Sharon Snyder (Butler)
160
4,000
6.5
Suzanne Snyder
4
100
.2
Neither Ronald nor Sharon possessed assets of sufficient value to finance the acquisition of the R.B.S. stock. Their respective purchases of stock were in fact facilitated by Bennie, who funneled funds to them through a bank account of his father-in-law. In addition, Bennie purchased certain construction equipment with $27,607 of his own funds, then transferred the equipment to R.B.S., which credited the sum to an account identified as "Notes Payable -- Officers." Of the total $61,200 par value *638 of R.B.S. stock issued, $52,607 was acquired with funds supplied by Bennie. [4]
In May, 1966, Bennie and Bernice defaulted on the two $250,000 notes, and USF&G as guarantor, paid the amounts owed to the bank. The bank assigned the two notes, deeds of trust, chattel trust deeds, and other collateral to USF&G. Bennie and Bernice owed approximately $800,000 to USF&G in 1966 as a result of USF&G's payment of the notes and completion of the bonded road projects. When USF&G commenced action to foreclose on the assets covered by the deeds of trust, Bennie and Bernice negotiated a settlement of their account for $319,000. USF&G agreed to release the Snyders from all liability arising from the road contracts and the two $250,000 notes. When they finalized the settlement agreement with USF&G, Bennie and Bernice arranged for USF&G to assign the two $250,000 notes, together with most of the collateral securing them, to R.B.S. According to a letter to USF&G memorializing the agreement, signed by Bennie and *639 Bernice in their individual capacities and by Bernice as secretary-treasurer of R.B.S., R.B.S. agreed to pay USF&G $175,000 in consideration of the assignment. The $175,000 to be paid by R.B.S. represented the cash portion of the total $319,000 settlement figure that had been negotiated by Bennie and Bernice. [5] Prior to the finalization of the settlement agreement, Ronald Snyder did not participate in the negotiations, and the involvement of R.B.S. was not disclosed to USF&G. Although the settlement with USF&G negotiated by Bennie and Bernice was structured so that R.B.S. appeared to receive the notes and collateral from USF&G in exchange for a payment of $175,000, in reality nearly all the cash was furnished by Bennie and Bernice. The major portion of the $175,000 was a $95,000 bank loan to R.B.S. which was endorsed personally by Bennie Snyder and secured by a lien on real estate owned by Bennie. Another $60,000 was routed from Bennie and Bernice to R.B.S. through transactions designed to conceal the source of the funds. The remaining $20,000 was provided *640 by R.B.S. Thus, $299,000 of the total $319,000 paid to settle the account with USF&G was furnished by Bennie and Bernice. The chattel trust deeds transferred to R.B.S. from USF&G represented encumbrances on most of the machinery and equipment used in Bennie's business. Sometime after the closing of the settlement agreement in 1966, R.B.S. made a "demand" on Bennie and Bernice to pay off the two $250,000 notes. When Bennie and Bernice failed to make good on the notes, R.B.S. further "demanded" that they transfer all of the remainder of the collateral to the corporation. Accordingly, R.B.S. received the real estate, including the residence of Bennie and Bernie [6], subject to the deeds of trust and the machinery and equipment subject to the chattel trust deeds, which represented substantially all of the remaining assets of Bennie and Bernice. At the time of the transfer of these assets to R.B.S., Bennie and Bernice were insolvent, as they had been at least since early 1964. Bennie discontinued his sole proprietorship sometime during 1965-1966. Since then, R.B.S. has conducted substantially *641 the same business. Although not a stockholder, and originally not an officer of R.B.S., Bennie in fact has remained the general manager of the business despite the observance of corporate formalities and the adoption of accounting and financial procedures consistent with the formation of R.B.S. Throughout the course of Bennie's financial difficulties, the formation of R.B.S., and the settlement with USF&G, the Internal Revenue Service had outstanding against Bennie and Bernice a determination of a deficiency in their income taxes for the years 1956, 1957 and 1959. By a stipulated decision filed with this Court on September 27, 1967, Bennie and Bernice agreed to statutory deficiencies for those years in the amount of $155,432. After so stipulating, however, Bennie and Bernice refused to pay any part of those deficiencies or the interest thereon, claiming that they were entitled to operating loss carrybacks from 1960, 1961 and 1962 which would offset the unreported income for 1956, 1957 and 1959 which produced the deficiencies for those years. The losses carried back resulted from additional depreciation claimed on amended returns for 1960-62. On October 13, 1967, the District Director *642 of Internal Revenue at Cincinnati, Ohio made assessments for Federal income taxes against Bennie and Bernice in the total amount of $232,726, which represented the stipulated deficiencies of $155,432 plus interest thereon to date. On June 19, 1968, a notice of Federal tax lien was filed in Greenbrier County, West Virginia. On November 30, 1973, the United States filed a civil suit in the United States District Court for the Southern District of West Virginia, naming as defendants Bennie Snyder, Bernice Snyder, Ronald B. Snyder, J. Sharson Snyder, and R.B.S. In that action, based on sections 7401, 7402, and 7403, [7] *643 *644 the United States sought to reduce to judgment the stipulated decision in this Court against Bennie and Bernice, to set aside as fraudulent conveyances the transfers of property from Bennie and Bernice to R.B.S., and to foreclose its tax liens upon the property of Bennie and Bernice, including the property transferred to R.B.S. Count I of the government's complaint in the District Court, after describing the assessments of tax and filings of tax liens noted above, alleged as follows: 9. By virtue of the assessments described above, the defendants, Bennie Snyder and Bernice Snyder, are indebted to the United States in the amount of $280,950.51, plus additional interest as provided by law. WHEREFORE, the plaintiff, United States, prays: That this Court order, adjudge and decree that the defendants, Bennie Snyder and Bernice Snyder, are indebted to the United States in the amount of $280,950.51, plus additional interest as provided by law. Count II of the complaint alleged as follows: 3. During a period of time between July, 1966 and October 15, 1966, and systematically thereafter, the defendants, Bennie Snyder and Bernice Snyder, purportedly conveyed their right, title and interest in all or substantially all of their real and personal property to the defendant, R.B.S., Inc., more particularly described in copies of deeds *645 and schedules of assets attached hereto as Exhibits A, B, and C, but that said purported conveyances were fraudulent in that they were made with actual intent on the part of the defendants, Bennie Snyder and Bernice Snyder, to hinder or defraud creditors, or in the alternative, that said purported conveyances were made without valuable consideration, at a time that the defendants, Bennie Snyder and Bernice Snyder, were indebted to the United States for Federal Taxes, and further that said purported conveyances rendered the defendants, Bennie Snyder and Bernice Snyder, insolvent or were made at a time that the defendants, Bennie Snyder and Bernice Snyder, were already insolvent. Attached to the government's complaint was a schedule of assets, principally comprised of business machinery and equipment, which were transferred to R.B.S. by Bennie and Bernice. Virtually all of the assets listed on that schedule were also included in the depreciation schedules attached to the tax returns of R.B.S. for its taxable years 1966 and 1967, and depreciation was claimed on those assets in those years. On its return for the taxable year 1973, R.B.S. claimed a deduction for depreciation on "Miscellaneous *646 Equipment" having a basis of $280,950.51. The 1973 return was the first return of R.B.S. to include an item designated "Miscellaneous Equipment" in its depreciation schedule. The $280,950.51 item designated "Miscellaneous Equipment" was entered on two different pages of the depreciation schedule attached to the 1973 return. On one page, the item was listed separately, between a list of assets grouped under the heading "Trucks and Mixers" and a list of assets designated "MACHINERY AND EQUIPMENT." However, the item also appeared on the last page of the depreciation schedule, where it was entered in handwriting (along with several other entries) at the end of a lengthy, typewritten list of assets headed "MACHINERY AND EQUIPMENT." No notation or explanation accompanied these entries. From the depreciation schedule, it was possible to determine only that the "Miscellaneous Equipment" was "acquired" on January 1, 1973, that its original basis was $280,950.51, and that it was subject to depreciation under the double declining balance method with a useful life of four years. R.B.S. did not acquire, in 1973 or in any other year, any asset or assets in the nature of "Miscellaneous Equipment" *647 having a cost basis of $280,950.51. The $280,950.51 item designated as "Miscellaneous Equipment" on the 1973 return of R.B.S. was the amount of the outstanding income tax liability of Bennie and Bernice Snyder, as alleged in the complaint filed in the district court proceeding. The item designated "Miscellaneous Equipment" was also entered on the tax returns of R.B.S. for the years 1974, 1976, and 1977, and was depreciated in those years. On those returns, the item was entered on the depreciation schedules within lengthy lists of assets, under the heading "MACHINERY AND EQUIPMENT." No notation or explanation accompanied these entries. The 1974 depreciation schedule listed 25 items of machinery and equipment. The 1976 and 1977 depreciation schedules each listed more than 50 items of machinery and equipment. The "Miscellaneous Equipment" item had the largest original basis of the assets listed as "MACHINERY AND EQUIPMENT" on each return for the years 1973, 1974, 1976 and 1977. On its returns for the taxable years 1973, 1974, 1976, and 1977, R.B.S. claimed deductions for depreciation on the item designated "Miscellaneous Equipment" totalling $245,831.20. The depreciation was computed *648 using the double declining balance method with a useful life of four years. [8] The deductions were claimed in the amounts of $140,475.58 in 1973, $70,237.47 in 1974, $7,023.68 in 1976, and $28,095.05 in 1977. [9] *649 During the years 1973 through 1977, Bernice Snyder was the secretary-treasurer of R.B.S. and was responsible for keeping the books of the corporation. She had no formal training in bookkeeping or accounting. Bernice sometimes consulted accountants on bookkeeping and other financial matters. Ronald Snyder generally did not assist Bernice with bookkeeping. He had no formal education in accounting although he had been to college. However, Ronald had broad responsibilities for the operations of R.B.S., including financial matters. He was an authorized signatory on the bank accounts of the corporation, and served as trustee of the R.B.S., Inc. Employee Pension Plan. He also authorized major purchases of equipment. In that regard, he helped determine the useful lives of such assets for depreciation purposes, and thereby acquired a working knowledge of depreciation. In addition to these activities related to R.B.S., Ronald prepared either in whole or in part his individual income tax returns for the years 1968, 1969, 1970 and 1972, and *650 therefore possessed a general knowledge of tax matters. In connection with preparing the 1973 income tax return of R.B.S., Bernice and Ronald discussed whether to claim a depreciation deduction based on the law suit filed by the United States in November, 1973. Bennie Snyder was also aware of this matter prior to the filing of the return. R.B.S. requested and received an additional extension of time (beyond the three month automatic extension) to file its 1973 tax return. Form 7005 requesting the extension stated as the reason for the request: "Our accountant has been unable to complete the books for the year 1973 due to illness, and work load." The return was filed on September 16, 1974. At some time in late 1974 Bernice contacted John B. Fisher[10], an attorney, in regard to the question of how to deal with the law suit on the tax return of R.B.S. [11]
The 1973 return filed by R.B.S. was not prepared by *651 a certified public accountant or other return preparer. It was signed only by Bernice. The returns filed by R. B.S. for the taxable years 1967 through 1972 were prepared by the accounting firm Brown, Edwards & Co. The returns filed by R.B.S. for the taxable years 1974 through 1977 were prepared by the accounting firm of Firebaugh & Berry, Inc. Sometime during 1974 or 1975, Jerry Firebaugh, the accountant who prepared the tax return of R.B.S. for the years 1974 through 1977, commenced an audit of the corporation's books and records. Firebaugh requested documentation regarding the "Miscellaneous Equipment" item. The Snyders provided Firebaugh with a letter dated January 2, 1975, to Bernice from Fisher. [12] *652 The letter referenced the civil action filed by the United States in November, 1973, and read as follows: Dear Mrs. Snyder: 1. This letter refers to your inquiry to me regarding the proper treatment by R.B.S., Inc. of its deduction for depreciation on sundry items of road building and accessory equipment for the taxable years since the filing of the referenced proceeding. 2. Schedules B and C attached to the Complaint in that cause include lists of assets transferred to R.B.S., Inc. at costs to the corporation which are claimed to be the following: (a) Exhibit B
-1. Assets total
$274.835.--
-2. Deduct W.Va. Real Estate
162,075.--
$112.760.--
(b) Exhibit C
-1. Assets total
231,779.23
-2. Deduct Buildings
67,200.--
164,579.23
Total Equipment
$277,339.23
3. The corporate income tax return should include a note typed, not on a separate piece of paper but on any blank space in the return itself, substantially in these words: "The basis of the said depreciable assets is taken from the Complaint filed in the case of USA v. Bennie Snyder, et al, USDC SD WVA, Civil Action No. 73-345-Ch filed 1973 November 30." Very truly yours, /s/ J. B. Fisher
J. B. Fisher
On September 3, 1982, the United States District Court for the *653 Southern District of West Virginia issued an opinion in favor of the United States in its action to reduce to judgment the tax assessments made against Bennie and Bernice for the years 1956, 1957 and 1959, to foreclose the Federal tax liens against the property of Bennie and Bernice, and to set aside as fraudulent conveyances the transfers of property to R.B.S. United States v. Snyder, an unreported case ( S.D.W.Va. 1982, 82-2 USTC par. 9683). The Court found that the formation of R.B.S., the issuance of $52,607 worth of R.B.S. stock in the names of Ronald and Sharon when in fact such stock was paid for with funds supplied by Bennie, the transfer of the notes and deeds from USF&G to R.B.S., and the ultimate transfer of assets to R.B.S., were steps in a scheme devised by Bennie and Bernice, with the willing participation and full knowledge of Ronald and Sharon, to hinder, delay and defraud their creditors, including the Internal Revenue Service. The Court further found that $52,607 worth of R.B.S. stock issued in the names of Ronald and Sharon was in equity deemed to be the property of Bennie and was subject to sale and foreclosure under the tax liens, as were all of the assets transferred *654 to R.B.S. The court set aside each transfer of assets to R.B.S. as null and void. Judgment was entered in favor of the United States against Bennie and the Estate of Bernice in the amount of $371,155. [13]
Bennie, Ronald an Suzanne filed a notice of appeal to the United States Court of Appeals for the Fourth Circuit from the opinion and judgment of the district court. Later, they requested a voluntary dismissal of their appeal. Petitioners Ronald and Suzanne Snyder executed a Form 872 by which they agreed to extend the period for assessment of their 1976 Federal income tax until December 31, 1980. On December 10, 1980, respondent issued to petitioners a statutory notice of deficiency for the years 1973, 1974, 1976 and 1977. Respondent increased petitioners' share of undistributed taxable income from R.B.S. for those years, the major adjustment being the disallowance of depreciation deductions on the asset designated "Miscellaneous Equipment" for the reason that the asset was never purchased. OPINION The first issue we must consider is whether R.B.S., Inc. is entitled *655 to deductions for depreciation for its taxable years 1973, 1974, 1976, and 1977 in the amounts of $140,475.58, $70,237.47, $7,023.68, and $28,095.05, respectively. These deductions were claimed on an item designated as "Miscellaneous Equipment" which first appeared ob the depreciation schedule attached to the 1973 return. That schedule, as well as those for years 1974, 1976, and 1977, indicated that "Miscellaneous Equipment," having a cost basis of $280,950.51 and a useful life of four years, was acquired on January 1, 1973 and was subject to depreciation under the double declining balance method. For each year in issue, the item in question was entered on the depreciation schedule as part of a list of assets under the heading "MACHINERY AND EQUIPMENT." No notation or explanation accompanied these entries. It is not disputed that R.B.S. did not acquire any asset or assets in the nature of "Miscellaneous Equipment" having a cost basis of $280,950.51 in 1973 or in any other year. The parties have stipulated that the $280,950.51 reported on the returns as "Miscellaneous Equipment" was in reality the amount of the outstanding income tax liability of Bennie and Bernice Snyder for the *656 years 1956, 1957 and 1959, as alleged in the complaint filed by the United States in the United States District Court in West Virginia. In the district court action commenced in November 1973, the government sought to reduce to judgment a stipulated decision in this Court against Bennie and Bernice for income tax deficiencies and interest thereon in the total amount of $280,950.51; to foreclose its Federal tax liens on all of the Snyders' property, including property that had been transferred to R.B.S.; and to set aside as fraudulent conveyances such transfers to R.B.S. R.B.S. had been formed by Bennie in 1964 in order to continue the operations of his road construction business, which suffered severe financial reverses in the early 1960s. By 1964 Bennie was insolvent, and owed his surety and guarantor, USF&G, over $800,000. He also at that time was aware of the claim by the Internal Revenue Service for the income tax deficiencies for 1956, 1957 and 1959. Ultimately, in an opinion issued in 1982, the district court ruled in favor of the United States on each count of its complaint. The court found that as part of a plan to hinder, delay and defraud their creditors, including the *657 IRS, Bennie and Bernice caused R.B.S. to be formed, directed that all of its stock be issued nominally to Ronald, Sharon and Suzanne, and transferred virtually all of their property to R.B.S. in a manner designed to create the appearance of a bona fide transaction between USF&G and R.B.S. The court also found that Bennie provided virtually all of the funds with which R.B.S. was capitalized, and virtually all of the consideration paid to USF&G in exchange for the notes and collateral transferred to R.B.S. Finally, the court found that approximately 86 percent of the R.B.S. stock, as well as the assets transferred to R.B.S., were in equity the property of Bennie and Bernice. [14]
Petitioners have not presented any coherent argument supporting their claim for the depreciation deductions in dispute. On brief, petitioners seem to advance the theory that the government's law suit in district court somehow gave rise to a positive adjustment to the basis of the corporation's machinery and equipment. In their briefs *658 and in the testimony of Ronald Snyder, petitioners refer to the law suit as creating additional "cost" or "value" of the assets transferred to R.B.S. To the extent that we are able to comprehend petitioner's argument, we find it to be without merit. In the first place, petitioners consistently during trial and on brief, confuse the issue by failing to distinguish between two separate items: the tax liability of Bennie and Bernice, which was the subject of the litigation, and the schedule of assets attached to the complaint, which listed assets that were fraudulently conveyed to R.B.S. in 1966 and were therefore subject to the Federal tax liens. It is clear that what was entered on the returns and depreciated was the amount of the tax liability, $280,950.51. However, petitioners ignore that fact and instead attempt to characterize the government's law suit as an assessment or claim against R.B.S. which represents the cost or "additional value" of the equipment it acquired in 1966. By this reasoning, they seek to justify an adjustment to R.B.S.'s machinery and equipment account. The source of the confusion concerning the item entered on the returns and the schedule of assets attached *659 to the complaint may have been the letter from Fisher to Bernice which R.B.S. 's accountant obtained during a subsequent audit. That letter refers to the schedule of assets in the complaint. By subtracting the value of certain real estate from the total value of those assets, Fisher arrived at the figure $277,339, which is stated to be the "cost" of the depreciable assets transferred to R.B.S. The connection between Fisher's $277,339 figure and the items on the returns is illusory; it is merely coincidental that Fisher was able to derive a figure that approximated the amount of the tax liability. We note, however, that Fisher's letter is dated January 2, 1975, more than three months after the return was filed. There are other, more fundamental, infirmities in petitioners' argument. It is clear from the record that the assets transferred to R.B.S. in 1966 were entered on the depreciation schedules of the corporation's returns for 1966 and 1967, and were depreciated in those years. [15] Most of those assets were assigned useful lives of two or three years; a small number were assigned useful lives of greater duration. It is obvious that by 1973, the year of the initial entry of the *660 disputed item, most of the assets received by R.B.S. in 1966 would have been fully depreciated. Petitioners do not explain how it is possible to make adjustments to basis with respect to assets that have been fully depreciated and presumably retired from service. The fundamental weakness in petitioners' case concerns a misconception, or possibly an intentional ambiguity, regarding the nature of the government's action in the district court.The primary defendants were Bennie and Bernice, not R.B.S.The claim for the $280,950 in income tax deficiencies and interest was asserted against Bennie and Bernice individually. R.B.S. was named as a defendant solely because the fraudulent conveyances of the Snyders' property to the corporation subjected certain assets to Federal tax liens, even while in the possession of R.B.S. Petitioners' statements, in testimony and on brief, that the $280,950 represented a liability of R.B.S. are simply erroneous. Petitioners have advanced no legal theory which would explain how the law suit to reduce to judgment the personal tax liability *661 of Bennie and Bernice could transform that personal liability into a liability of R.B.S. Curiously, the only potentially meritorious theory in support of the deductions in issue was articulated by respondent in his opening brief, but was not directly addressed by petitioners. This theory concerns the possibility of an adjustment to the cost basis of R.B.S.'s depreciable assets on account of the corporation's liability as a transferee for the tax liability of Bennie and Bernice. Since petitioners did not argue this theory, and our research indicates it would not afford relief to petitioners anyway, we will not discuss it at length herein. Suffice it to point out that the government's complaint filed against Bennie, et al, in November, 1973, sought only a judgment against Bennie and Bernice and to enforce the tax liens against the property that had been transferred without consideration to R.B.S. There was no claim that R.B.S. or Ronald were liable, secondarily or otherwise, for the tax liabilities of Bennie and Bernice. Furthermore, the potential for any such claim was too contingent and indefinite during the years here involved to support an increase in R.B.S.'s cost basis in the *662 assets received from Bennie under the principle of Crane v. Commissioner,331 U.S. 1 (1947). See Columbus and Greenville Ry. Co. v. Commissioner,42 T.C. 834 (1964), affd. per curiam 358 F.2d 294 (5th Cir.), cert. denied 385 U.S. 827 (1966). We conclude that R.B.S. was not entitled to depreciation deductions against the $280,950.51 "Miscellaneous Equipment" account for any of the years 1973, 1974, 1976 and 1977. That amount was not paid by R.B.S. for any depreciable assets in any of those years and did not represent a depreciable asset. We turn now to the issue concerning the additions to tax for fraudulent underpayments under section 6653(b). Fraud, for the purposes of section 6653(b), is an intentional wrongdoing on the part of a taxpayer with the specific purpose of evading a tax known or believed to be owing. Stoltzfus v. United States,398 F.2d 1002, 1004 (3rd Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Respondent has the burden of proving fraud by clear and convicing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure.Fraud is never presumed, but *663 must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85 (1970). However, because direct proof of fraud is rerely available, respondent may prove fraudulent intent by means of circumstantial evidence. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion, 578 F.2d 1383 (8th Cir. 1978). A willful attempt to evade tax may be found from any conduct calculated to mislead or conceal. Acker v. Commissioner,26 T.C. 107, 112 (1956). Initially, in order to impose the addition to tax for fraud under section 6653(b), respondent must show that petitioners understated the tax required to be shown on their returns.Our finding that there is no basis for the depreciation deductions claimed on the item designated "Miscellaneous Equipment" satisfied this requirement. As an electing small business corporation under Subchapter S of the Code, R.B.S.'s net profits *664 or losses were passed through to petitioners and reported on their individual returns. Therefore, the total of $245,831 of depreciation deductions claimed on the Miscellaneous Equipment" caused substantial understatements of petitioners' income tax liability for the years involved. These deductions caused an understatement of petitioners' income tax liability of approximately $52,000 in 1973 and $37,000 in 1974, and caused lesser understatements in 1976 and 1977. Viewing the record in its entirety, we are convinced that the understatements of petitioners' income tax liability resulting from the depreciation deductions in issue are due to fraud, and we therefore sustain the additions to tax under section 6653(b). In light of the history of R.B.S., the circumstances surrounding the entries on the returns, the manner in which the items were entered on the depreciation schedules, and Ronald's experience in tax and business matters, we are unable to accept petitioners' contention that Ronald and Bernice had any good faith belief in the propriety of the depreciation deductions claimed. Moreover, the vague and inconsistent testimony presented by petitioners, as well as their failure to *665 present any coherent argument supporting the deductions, confirmsour findings that the entries on the depreciation schedules constituted a fraudulent attempt to reduce their tax liability. We think that the creation of the "Miscellaneous Equipment" asset was merely an additional step in the Snyders' concerted effort, since the early 1960's, to avoid paying the income tax liability of Bennie and Bernice for the years 1956, 1957 and 1959. Petitioners' characterization of the "Miscellaneous Equipment" entries as somehow representing the "additional value" of assets transferred to R.B.S. distorts reality. It is stipulated that the $280,950.51 item represents the personal income tax liability of Bennie and Bernice as alleged in the law suit filed in district court. Presumably, the Snyders intended to recoup that tax liability by writing it off against the income of R.B.S. Petitioners attempted to obscure the origin of this item by linking it to the schedule of assets attached to the government's complaint. As discussed earlier, the entries on the returns had no connection with that schedule of assets. Petitioners attempt to depict Bernice and Ronald as engaged in a good faith inquiry *666 of their attorney and accountant regarding the propriety of the depreciation deductions in issue. Their argument here is not convincing and is inconsistent with the record. It is obvious from Firebaugh's testimony that he did not conduct his audit until some time, perhaps more than a year, after the 1973 return was filed. [16] Thus, contrary to the statement in petitioners' brief, he could not have advised Bernice and Ronald at the time they made the decision to claim depreciation on the disputed item. Firebaugh, in fact, seemed confused about the basis for the deductions, but apparently did not pursue the matter after receiving a copy of Fisher's letter. Rather than relying on the advice of an accountant when making the decision to claim the disputed depreciation, the evidence suggests that the Snyders pursued a course of action quite to the contrary. *667 The 1973 return of R.B.S., on which the depreciation for "Miscellaneous Equipment" was first claimed, was the only return during the ten-year period from 1967 through 1977 that was not prepared by a frofessional accountant. This fact is especially significant considering that the reason asserted for requesting an additional extension of time to file the 1973 return was that petitioners' accountant was overloaded. Another pertinent fact is that the Snyders switched accounting firms between 1972 and 1974. Petitioners have not attempted to explain the failure to use an accounting firm to prepare the 1973 return, or the decision to switch to a different accounting firm after 1973. We have difficulty attributing this coincidence of facts entirely to chance. Petitioners' failure to produce any explanation raises the presumption that the evidence would be unfavorable to their case. Wichita Terminal Elevator Co. vs. Commissioner,6 T.C. 1158, 1165 (1946), affd., 162 F.2d 513 (10th Cir. 1947). Petitioners also rely on the letter from Fisher to Bernice to support their argument that the deductions were claimed with the advice of counsel. We are unable to accord any weight to that letter, *668 which was admitted solely to show what Firebaugh relied on in attempting to substantiate the item on audit. There is no evidence in the record concerning the circumstances surrounding this letter, especially the timing and extent of the communications between Bernice and Fisher. Obviously, as the letter was dated January 2, 1975, it could not have been relied on in preparing the return filed in September 1974. Furthermore, the letter itself does not support the action taken by petitioners in preparing the 1973 return for R.B.S. The letter arrived at a total "costs to the corporation" of the equipment listed on the attachment to the complaint of $277,339.23 [17] while the cost basis entered on the depreciation schedule was $280,950.51. The letter also suggested that a note should be typed on the return that would have explained the source of the basis claimed for the assets and would have called attention to the particular item on the depreciation schedule. We find the manner in which the "Miscellaneous Equipment" *669 item was entered on the returns to be another compelling indicia of fraudulent intent. The inclusion of the item in the lengthy lists of assets on the depreciation schedule, without any notation or explanation, is inconsistent with a good faith belief in the legitimacy of the deductions. Clearly, the entry was designed to appear as a discrete depreciable asset or group of assets acquired in 1973. If the entry had been intended as an adjustment to the aggregate basis of the corporation's assets, as petitioners' argument seems to suggest, we doubt that the item would have been reported as having a useful life of four years and subject to depreciation under the double declining balance method. Moreover, any such adjustment to basis would have to be allocated among all the assets, both depreciable and non-depreciable. Usually a finding of fraud is based on an omission of an item from a return. There is no reason, however, why the inconspicuous entry of an item on a return, which serves to reduce taxable income, with full knowledge on the part of the taxpayer that the item is not what it purports to be is any less a fraudulent act that an omission of an item from a return. The entry *670 on the return might be easier for respondent to spot than an omission, but we are not concerned with respondent's perception. Rather, we are concerned with whether the taxpayer deliberately intended to evade tax by claiming a deduction to which he knew he was not entitled. We think this was what Ronald (and Bennie) was trying to do when he approved the insertion of the $280,950.51 "Miscellaneous Equipment" item in the depreciation schedule of R.B.S. and caused it to claim deductions for depreciation thereon in each of the years before us. See Neaderland v. Commissioner,52 T.C. 532 (1969), affd. 424 F.2d 639 (2d Cir.), cert. denied, 400 U.S. 827 (1970); Allegheny Amusement Co. v. Commissioner,37 B.T.A. 12 (1938); Jahner v. Commissioner,T.C. Memo 1978-333. In making a determination on the fraud issue, we are unable to ignore the events surrounding the formation of R.B.S., and the fraudulent transfers of assets from Bennie and Bernice to the corporation. The district court found these events to be steps in a scheme to defraud the creditors of Bennie and Bernice, including the Internal Revenue Service, in which Ronald knowingly and willingly participated. Against this background, *671 it hardly seems surprising that the Snyders would continue their effort to evade their tax liability by creating a fictitious depreciable asset. Finally, we have no hesitation in ascribing fraudulent intent to Ronald on the facts before us, even though Bernice was primarily responsible for the bookkeeping of R.B.S. Ronald had broad responsibilities for the operations and finances of R.B.S., and was experienced in tax matters, including the depreciation of business assets. He was aware of the fact that Bennie and Bernice were attempting to avoid their tax liabilities for the years 1956, 1957 and 1959 by claiming loss carrybacks from 1960, 1961 and 1962 through assertions of amended and increased depreciation deductions for those years. He and Bernice discussed whether to claim the depreciation on the "Miscellaneous Equipment" when they were preparing the 1973 return. Ronald at all times was fully aware of the origin of the $280,950 figure and the manner in which it was treated on the returns. In fact, Ronald, and not Bernice, signed the returns for 1974, 1976, and 1977. On the record before us, we have no doubt that Ronald was an active and fully informed participant in the decision *672 to claim depreciation deductions on what was in fact the tax liability of Bennie and Bernice. For the reasons here discussed, we find that a substantial part of each understatement of tax liability for petitioners' taxable years 1973, 1974, 1976 and 1977 was due to fraud on the part of Ronald Snyder.Accordingly, we sustain the additions to tax under section 6653(b). Furthermore, we find the returns filed by petitioners for each of those years were fraudulent with the intent to evade tax. Hence, the statute of limitations provided in section 6501(a) does not prohibit the assessment of tax for the years 1973 and 1974. [18] *673 Section 6501(c)(1). Petitioner do not dispute the effectiveness of the agreement executed pursuant to the provisions of section 6501(c)(4), which extended the statute of limitations with respect to the taxable year 1976 until December 31, 1980. To reflect concessions by the parties on other issues, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the taxable years in issue. The additions to tax for fraud under sec. 6653(b)↩ are asserted only against petitioner Ronald Snyder.
2. An additional issue presented at trial involved respondent's disallowance of travel expenses claimed on the returns of R.B.S., Inc. for taxable years 1976 and 1977 in the amount of $3,600 each year. It was stipulated that these amounts consist of payments made by R.B.S., Inc. to Ronald Snyder, Harry Snyder, and Bernice Snyder, at the rate of $100 per month per person, during 1976 and 1977.Counsel agreed at trial that unless petitioner could produce receipts or other evidence substantiating the purpose of these expenditures, no amount would be allowed as a deduction.Petitioner produced no such evidence. Furthermore, on brief petitioner included these amounts under the heading "Items agreed," and stated that the only remaining issues are those concerning the depreciation deduction. We take this to be a concession of the travel expense issue.
3. Bennie Snyder was not designated as an officer of R.B.S. at its inception. During the years in issue, however, Bennie was identified on the returns of R.B.S. as vice-president.↩
4. Ronald contributed $6,200 of his own cash and $2,293 of equipment to R.B.S. Suzanne contributed $100. The $61,200 of common stock so issued represented the entire capitalization of R.B.S.↩
5. The balance of the settlement figure consisted of equity of $144,000 in real estate transferred to USF&G by Bennie and Bernice.↩
6. Bennie and Bernice continued to live in the residence for at least nine years thereafter, rent free.↩
7. As effective in 1973, sec. 7403 provides in pertinent part: SEC. 7403. ACTION TO ENFORCE LIEN OR TO SUBJECT PROPERTY TO PAYMENT OF TAX. (a) Filing.--In any case where there has been a refusal or neglect to pay any tax or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary or his delegate, may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect to such tax or liability or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability. (b) Parties.--All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto. (c) Adjudication and Decree.--The Court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States. If the property is sold to satisfy a first lien held by the United States, the United States may bid at the sale such sum, not exceeding the amount of such lien with expenses of sale, as the Secretary or his delegate directs.
8. Although the parties stipulated that the depreciation was claimed under the double declining balance method, the actual deductions claimed deviate from that method in 1976 and 1977. The 1976 depreciation schedule indicated that the declining balance method was used, but the $7,023.68 amount claimed could not have been derived from that method. The 1977 depreciation schedule indicates that in that year, the method was changed from declining balance to "Remaining Life." Presumably, the $28,095.05 deduction claimed in 1977 eliminated the remaining basis (apparently no salvage value was taken into account), but this is not clear because it is not known what amount was claimed in 1975, which year is not before us. ↩
9. As an electing Subchapter S corporation, the net profits or losses of R.B.S. were passed through to its shareholders. Petitioners held over 93 percent of the stock of R.B.S., so that the depreciation deductions claimed on the corporate returns had a substantial impact on their individual income tax liability. These deductions reduced petitioners' tax liability by approximately $52,000 in 1973, and $37,000 in 1974.
10. John B. Fisher is also the attorney representing the petitioners in this case. ↩
11. It is not clear whether Bernice contacted Fisher before or after the filing of the 1973 return. The record does not indicate the nature and extent of her contact with Fisher regarding this matter.↩
12. Respondent objected to the introduction of this letter into evidence on the grounds of hearsay. Fisher, who is counsel for petitioners in this case, stated that he has no "independent memory" of the letter or the events surrounding it. Bernice was deceased at the time of trial. The letter was received into evidence for the purpose of showing what Firebaugh relied on in performing his audit, and not for proving the truth of the statements in the letter.
13. This amount consists of the stipulated deficiency for the taxable years 1956, 1957 and 1959 of $155,432, plus interest.↩
14. Neither party has raised the argument that Bennie Snyder is the shareholder who is properly taxable on the income of R.B.S. See Eundenberger v. Commissioner,T.C. Memo 1980-113↩.
15. We assume that these assets continued to be depreciated in subsequent years. Returns for those years are not in evidence.↩
16. Firebaugh stated that he did not begin to work for R.B.S. until 1974 or 1975. He also noted that for the purposes of his audit, he did not consider the $280,950 item to be material because it had a low book value and a "minimal" effect on taxes. This indicates that Firebaugh must have been preparing returns for years after 1974.↩
17. The letter refers to a list of assets transferred to R.B.S., Inc. "at costs to the corporation." The complaint and lists attached refer to the "value" of the assets transferred.↩
18. One further point regarding the deficiencies for the years 1973 and 1974 requires clarification. On brief, respondent indicates that because no part of the understatements were due to fraud on the part of Suzanne Snyder, the tax for 1973 and 1974 may not be assessed against her. This is incorrect; although Suzanne is not liable for the additions to tax under sec. 6653(b), she remains liable for the deficiencies for 1973 and 1974. The fraud on the part of Ronald is sufficient to invoke sec. 5601(c), and once the bar of the statute of limitations is removed, Suzanne remains liable for the deficiencies by virtue of the joint and several liability provisions of sec. 6013(d)(3). Vannaman v. Commissioner,54 T.C. 1011↩ (1970).